**Elzra WIGGERFALL,
Petitioner–Appellant,**

v.

**Charlie JONES, Warden,
Respondent–Appellee.**

**No. 89–7022.**

United States Court of Appeals,
Eleventh Circuit.

Dec. 14, 1990.

Alison M. MacDonald, Mobile, Ala., for petitioner-appellant.

Fred Bell, Asst. Atty. Gen., Montgomery, Ala., for respondent-appellee.

---

Before HATCHETT and ANDERSON, Circuit Judges, and GODBOLD, Senior Circuit Judge.

GODBOLD, Senior Circuit Judge:

In *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the Supreme Court of the United States held that the defendant was convicted of capital murder in violation of due process when the jury that passed judgment on him was precluded by Alabama statute from finding him guilty of lesser included noncapital offenses. Elzra Wiggerfall was convicted and sentenced to life imprisonment without possibility of parole, after a trial in which the court, in compliance with this same statute, failed to charge the jury that it could consider whether Wiggerfall had committed lesser included offenses. We find that Wiggerfall's conviction was obtained in violation of the principles of due process set out in *Beck* and reverse the district court's denial of Wiggerfall's petition for habeas corpus.

### FACTS

On the night of September 4, 1976 Wiggerfall and three other men, Larry Cheatham, Jerome Lynch, and Eddie Lee Johnson, decided to rob a service station in Mobile, Alabama. The attendant on duty at the station, Linda Scott, was shot and killed that night. Police arrested Wiggerfall three days later as a suspect. He was tried on October 25, 1977 for the intentional killing of Scott during a robbery or attempted robbery, a capital offense under the statute in existence at that time. Ala. Code § 13–11–2(b) (1975) (repealed).

At the trial Sergeant Vincent Richardson of the Mobile Police Department testified that he and other members of the Department interrogated Wiggerfall on the night of his arrest. During this interrogation, according to Richardson, Wiggerfall gave a statement in which he denied shooting Scott but admitted planning the robbery with Cheatham, Lynch and Johnson. In this statement Wiggerfall claimed that he remained in the car some distance away from the service station while the others attempted to rob it.

Johnson, Cheatham and Lynch each testified for the prosecution. Johnson testified that on the night of September 4 he gave Wiggerfall a handgun that Johnson had taken from a third person. According to Johnson, the group decided to rob the service station and drove to it in Cheatham's car. Johnson, Lynch, and Wiggerfall walked up to the outside window of the station while Cheatham remained in the car a couple of blocks away. Wiggerfall told Scott, who was inside the station on the other side of the window, that this was a holdup and demanded money, but Scott only laughed and refused. Johnson testified that Wiggerfall then pointed the gun at Scott; Johnson and Lynch turned and ran across the street, and at that point Johnson heard a gun fire.

Lynch testified that he was with the others on the night of September 4, that he was near the window of the service station when Scott was shot, and that he saw Wiggerfall shoot her. Lynch provided no details of the shooting or of anything else occurring that night. Cheatham testified that he was with the others on the night of September 4 and that he remained in his car by himself while the others went to the station and returned.

Wiggerfall testified in his own behalf at trial. He admitted that he was with Johnson, Lynch and Cheatham in Cheatham's car on the night of September 4 and that he gave them advice about robbing the service station. Wiggerfall stated that he drove the group to the station and that he parked the car and remained in it while the other three walked to the station. Wiggerfall claimed that they later came running back to the car and that Johnson told him that Lynch had shot Scott.

After deliberating for half an hour, the jury found Wiggerfall guilty of capital murder. Under § 13–11–2, this verdict had the effect of fixing Wiggerfall's punish-

ment as death.[1] On December 6, 1977 the state court judge conducted a hearing at which he sentenced Wiggerfall to life without possibility of parole.[2]

Wiggerfall did not file a direct appeal. He later filed three writs of error *coram nobis* in Alabama state court, all of which were denied. The Alabama Court of Criminal Appeals affirmed these denials without written opinions. Wiggerfall then filed this § 2254 petition pro se in the U.S. District Court for the Southern District of Alabama. After transcripts from the state proceedings were filed, the magistrate concluded that no evidentiary hearing was necessary and recommended denial of the petition. The district court adopted the report and recommendation of the magistrate and denied relief. Still acting pro se, Wiggerfall appealed. This court appointed counsel for Wiggerfall on appeal. We address only his due process claim relating to the trial court's failure to charge the jury on lesser included noncapital offenses.[3]

■■■ Following the Supreme Court's ruling in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the State of Alabama enacted a capital murder statute designed to direct and limit the jury's discretion in the imposition of the death penalty. Act of Sept. 9, 1975, No. 213, 1975 Ala. Acts 701 (codified at Ala.Code §§ 13–11–1 et seq. (1975) (repealed 1981)). Two features of that statute are particularly important to the resolution of this case. First, the statute mandated that the jury "fix the punishment at death" if it determined that the defendant was guilty of committing one of enumerated offenses with aggravation. § 13–11–2(a). Second, the statute precluded the trial court from giving the jury the option of convicting the defendant of a lesser included offense that did not carry the death penalty. *Id.*

This statutory scheme afforded the jury no discretion to influence the defendant's sentence in any way in a capital murder case other than to impose a mandatory sentence of death by its determination of guilt. The jury had no option to convict the defendant of murder and impose a lesser sentence than death. The jury bore no discretion to recommend to the sentencing judge a lesser sentence than death. And the jury was not allowed to convict a defendant who it believed beyond a reasonable doubt, on the basis of the evidence before it, had committed a serious crime of any lesser included offense besides capital murder. The 1975 statute effectively forced the jury into "an all-or-nothing choice between capital murder and innocence." *Spaziano v. Florida,* 468 U.S. 447, 455, 104 S.Ct. 3154, 3159–60, 82 L.Ed.2d 340 (1984)

---

1. Section 13–11–2 provided:

   If the jury finds the defendant guilty, it shall fix the punishment at death when the defendant is charged by indictment with any of the following offenses and with aggravation, which must also be averred in the indictment, and which offenses so charged with said aggravation shall not include any lesser offenses.

2. Section 13–11–3 (1975) provided:

   If the jury finds the defendant guilty of one of the aggravated offenses listed in section 13–11–2 and fixes the punishment at death, the court shall thereupon hold a hearing to aid the court to determine whether or not the court will sentence the defendant to death or to life imprisonment without parole. In the hearing, evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to any of the aggravating or mitigating circumstances enumerated in sections 13–11–6 and 13–11–7. Any such evidence which the court deems to have probative value may be re-

   ceived, regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements; provided further, that this section shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the state of Alabama. The state and the defendant, or his counsel, shall be permitted to present argument for or against the sentence of death.

3. Wiggerfall's petition alleges seven other grounds for relief: (1) insufficiency of the evidence, (2) error in the admission of his statements to law enforcement officers during the interrogation, (3) error in the trial court's jury instruction on the definition of reasonable doubt, (4) error in the jury instruction on the definition of malice, (5) error in the jury instruction that witnesses are presumed to speak the truth, (6) sentence disparity, and (7) ineffective assistance of counsel. Because we find his conviction invalid under *Beck,* we do not address these other issues.

(citing *Beck*, 447 U.S. at 638–43, 100 S.Ct. at 2390–93). By choosing innocence the jurors would knowingly release a defendant back into his—and possibly their—community.

Although the language of § 13–11–2(a) suggests that the Alabama statute was a mandatory death penalty law, like the statutes ruled unconstitutional in *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), and *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), the trial judge, not the jury, actually bore ultimate responsibility for sentencing the defendant found guilty of capital murder. § 13–11–3. The statute did not require the judge to impose the death penalty but gave the judge the alternative of a sentence of life imprisonment without possibility of parole. The trial judge was not required to afford any weight to the jury's forced "fixing of punishment at death," § 13–11–2, when it determined and imposed sentence on the defendant. *See Baldwin v. Alabama*, 472 U.S. 372, 382–86, 105 S.Ct. 2727, 2733–35, 86 L.Ed.2d 300 (1985). Nonetheless, the probable popular understanding of the operation of the Alabama statute was that the jury imposed the death penalty on the defendant by finding him guilty of capital murder and that the trial court, acting on its own, could later reduce this sentence to life imprisonment without possibility of parole. *See Baldwin*, 472 U.S. at 394 n. 2, 397 & n. 6, 105 S.Ct. at 2729 n. 2, 2732 & n. 6 (Stevens, J., dissenting). Trial judges instructed juries that they had to impose the death sentence if they found defendants guilty, carrying the implication that this sentence was final, since jurors were not informed that the judge would impose final sentence independently. *Hopper v. Evans*, 456 U.S. 605, 608, 102 S.Ct. 2049, 2051, 72 L.Ed.2d 367 (1982); *Beck*, 447 U.S. at 639 & n. 15, 100 S.Ct. at 2390 & n. 15. Thus the jury that convicted Wiggerfall had reason to believe that its only choices were to sentence him to death or to acquit him entirely. In its charge to the jury the trial court made these comments:

> [Y]ou as citizens of this community [who] are called into a grave case of this nature certainly have a reason to know what type of offenses are embraced within Act 213 [the capital murder statute]; and just to give you a complete background of Act 213, I am going to read you the provisions of Section 2, and then I am going to give you fourteen illustrations of when this Act of Capital Punishment would apply.

> Section 2 says: "If the jury finds the Defendant guilty, they shall fix the punishment at death when the Defendant is charged by indictment with any of the following offenses and with aggravation which must also be averred in the indictment, and which offenses so charged with said aggravation shall not include any lesser offenses." *In other words, he is either guilty or he's not guilty of electric chair murder if you find any of the following offenses with aggravation in the offense:*

Trial Transcript at 165 (emphasis added). Later, after listing the offenses set out in § 13–11–2 and charging the jury on other matters, the judge concluded his charge by saying:

> Now, if after a full and fair consideration of all the testimony in this case, the State has not proven beyond a reasonable doubt and to a moral certainty the material allegations of the offense of capital murder, then it would be your duty to acquit the defendant, and the form of your verdict would be—right here written on the back the indictment, "We, the jury, find the defendant not guilty."

> On the other hand, if the State has proved beyond a reasonable doubt and to a moral certainty the material allegations of the offense of capital murder as contained in Act 213 of the 1975 Legislature, then it is your duty to fix the punishment at death by electrocution. In that event, the form of your verdict would be right here (indicated), "We, the jury, find the defendant guilty of capital murder under Act 213, 1975 Legislature of Alabama, and fix the punishment at death by elec-

trocution." That will go right on the back of the indictment.

*Id.* at 165.

After the jury returned its verdict, the trial judge addressed Wiggerfall, and said, "the Court did not call to the jury's attention the provisions of section 3 that says that if the jury finds the defendant guilty of one of the aggravated offenses listed in Section 2 hereof and fixes the punishment at death, the Court shall thereupon hold a hearing to aid the Court to determine whether or not the Court shall sentence the defendant to death or to life imprisonment without parole." Trial transcript at 168–69.

The Supreme Court ruled in *Beck* that the Alabama statutory scheme violated the defendant's due process rights under the facts of that case by impermissibly restricting the jury's discretion. In *Beck* the jury was confronted with evidence tending to show that the defendant had committed a serious but noncapital offense and that the defendant thus posed a significant danger to the community. The Court reasoned that precluding the jury from convicting Beck of the noncapital offense and forcing it to either convict him of capital murder and fix his punishment at death or to acquit and release him undermined the reliability of the jury's verdict without serving any countervailing purpose.

In the final analysis the difficulty with the Alabama statute is that it interjects irrelevant considerations into the factfinding process, diverting the jury's attention from the central issue of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime. Thus, on the one hand, the unavailability of the third option of convicting of a lesser included offense may encourage the jury to convict for an impermissible reason—its belief that the defendant is guilty of some serious crime and should be punished. On the other hand, the apparently mandatory nature of the death penalty may encourage it to acquit for an equally impermissible reason— that, whatever his crime, the defendant does not deserve death. In any particular case these two extraneous factors may favor the defendant or the prosecution or they may cancel each other out. But in every case they introduce a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case.

*Beck,* 447 U.S. at 642–43, 100 S.Ct. at 2392.

■ In this case the district court determined that if the trial court's failure to charge the jury on lesser included offenses was a constitutional violation, then that error was harmless. Relying on our opinion in *Rembert v. Dugger,* 842 F.2d 301 (11th Cir.), *cert. denied,* 488 U.S. 969, 109 S.Ct. 500, 102 L.Ed.2d 536 (1988), the court considered that the Supreme Court in *Beck* held only that a death sentence could not be imposed when the jury was deprived of the opportunity of considering a noncapital offense supported by the evidence, and although the Wiggerfall jury verdict fixed the penalty of death insofar as the jury was concerned, the judge's later action, after a hearing, of imposing a sentence of life imprisonment without parole eliminated the concern that gave rise to Wiggerfall's right and rendered harmless the constitutional error in instructions.

However, the aspect of his trial that Wiggerfall contends is unconstitutional is the jury's determination of guilt, not the sentence imposed by the trial judge. "This Court's concern in *Beck* was that the judge would be inclined to accept the jury's *factual finding* that the defendant was guilty of a capital offense, not that the judge would be influenced by the jury's 'sentence' of death. To 'correct' an erroneous guilty *verdict*, the sentencing judge would have to determine that death was an inappropriate punishment, not because mitigating circumstances outweighed aggravating circumstances, but because the defendant had not been proved guilty beyond a reasonable doubt." *Baldwin,* 472 U.S. at 387, 105 S.Ct. at 2736 (emphasis added). *See also Spaziano,* 468 U.S. at 455, 104 S.Ct. at 3159: "The goal of the *Beck* rule ... is to eliminate the distortion of the factfinding process that is created when the jury is

forced into an all-or-nothing choice between capital murder and innocence."

In *Rembert* the defendant was tried in Florida for first degree felony murder. Under the Florida statutory scheme, after a jury has found a defendant guilty of capital murder, the trial judge must conduct a separate sentencing hearing before the jury that convicted the defendant. At this hearing the jury has the duty to consider mitigating and aggravating circumstances and to render an advisory sentence of either life imprisonment or death. Fla. Stat.Ann. § 921.141 (West 1985). Although the jury's advisory sentence is not binding on the trial judge, it is entitled to "great weight". *Tedder v. State,* 322 So.2d 908, 910 (Fla.1975). "It is ... entitled to great weight, reflecting as it does the conscience of the community, and should not be overruled unless no reasonable basis exists for the opinion." *Richardson v. State,* 437 So.2d 1091, 1095 (Fla. 1983).

The jury convicted Rembert of first degree murder and, after the sentencing hearing, it recommended a sentence of life imprisonment. The trial court then imposed a life sentence on the defendant. Reviewing the district court's denial of relief under § 2254, we held that *Beck* applied, and that the trial court committed constitutional error in failing to charge the jury on lesser included noncapital offenses.[4] We went on to hold, however, that "[t]he constitutional error by the state trial judge ... was rendered harmless by the *jury's* imposition of a life sentence." *Rembert,* 842 F.2d at 303 (emphasis added). We were able to express greater confidence in the reliability of the jury's determination of guilt in *Rembert* than the Supreme Court was able to in *Beck,* because the *Rembert* jury had the ability under the Florida statutory scheme to express a meaningful opinion, indeed a close to conclusive opinion, on the issue of whether the defendant would receive the death sentence as a matter distinct from his guilt of the substantive offense. The Florida jury was not subject to the distorting effects of the type of "all-or-nothing" scheme under which Beck's (and Wiggerfall's) jury operated. Although the jury in *Rembert* should have been instructed on lesser included offenses, it was able to make a decision that the defendant was guilty of a

---

**4.** In the present case, the court expressed the view that *Rembert* was not a capital case. On the contrary, we clearly rejected the State of Florida's argument that *Rembert* was a noncapital case because the defendant received a life sentence. "*Beck* is unequivocal in setting forth the requirement that *as long as there is a possibility of a death sentence, a defendant has a constitutional right to the relevant lesser included instructions.* ... Each time Rembert attempted to have the jury receive the additional instructions, Rembert faced capital conviction and sentencing. It is clear that the trial court erred in not accepting Rembert's waiver of the applicable statute of limitations." 842 F.2d at 303 (emphasis added). *Accord Beck,* 447 U.S. at 643, 100 S.Ct. at 2392 (jury determination of guilt or innocence in every case under Ala.Code § 13-11-2 suffers from "a level of uncertainty and unreliability into the factfinding process that cannot be tolerated").

This case, like *Rembert,* is clearly a capital case for purposes of a *Beck* analysis, because at the time the jury made its determination of guilt, Wiggerfall was subject to the death penalty. The fact that a lesser sentence was later imposed does not change the nature of the case at the time the guilt determination occurred.

*Compare Rembert with Perry v. Smith,* 810 F.2d 1078 (11th Cir.1987) (per curiam) (finding no due process violation in failure to instruct jury on lesser included offenses in "noncapital murder case" in which defendant received sentence of life imprisonment under Ala.Code § 13A-6-2, even though defendant could have been sentenced to death under this statute). The jury that convicted the defendant in *Perry* also operated under a statutory scheme that was substantially different from the one in this case. *See Perry v. State,* 455 So.2d 999, 1000 (Ala.Ct. Crim.App.1984) (Perry found guilty under Ala. Code § 13A-6-2 (1982)). After the Supreme Court's ruling in *Beck,* the State of Alabama enacted a new capital murder statute that affords the defendant a right to a sentencing hearing conducted before the jury that convicted him. Ala.Code § 13A-5-46(a), (b) (1982). This hearing provides the jury an opportunity to consider aggravating and mitigating circumstances and to issue a recommendation of either life imprisonment without parole or death, which the trial judge must consider in determining and imposing sentence. §§ 13A-5-46(a), (e), 13A-5-47(e). Under this statute, the jury is presumably not charged that it must fix a sentence of death if it finds the defendant guilty, nor that the trial judge ultimately determines the sentence.

serious crime but deserving of a lesser penalty than death. The jurors were not led to believe by the trial judge that they had a choice of sentencing Rembert to death by electrocution or releasing him and that their choice was irrevocable. Because of its power to recommend sentence the jury had overall authority that served at least some of the interests of the "third option," the absence of which was critical in *Beck.* The element in *Rembert* that brought within constitutional limits an otherwise unconstitutional process was what the jury could, and did, do. It recommended life, and under Florida law that recommendation carried the great power and force we have described, not to be overruled "unless no reasonable basis exists for the opinion." Reiterating, "the constitutional error ... was rendered harmless by the *jury's* imposition of a life sentence." *Rembert,* 842 F.2d at 303. There is no such element in this case. *Beck* was concerned with distortion of the jury process that "enhances the risk of an unwarranted conviction." *Beck,* 447 U.S. at 638, 100 S.Ct. at 2390. Wiggerfall's jury neither did, nor could, take any action to eliminate the possibility of distortion in its deliberations and the "risk of an unwarranted conviction." That the judge lessened the impact of the jury verdict did not give Wiggerfall the undistorted jury consideration to which he was entitled. The judge could, and did, reduce to life the jury's fixing of death, but his action necessarily was based on review of aggravating and mitigating circumstances, not on review of the sufficiency of the evidence to support the jury's verdict. He could not remove the risks of distortion and unreliability in the factfinding and verdict; he could only mitigate the sentence on other grounds.

In *Beck* itself the State argued that even if a defendant is erroneously convicted, the ultimate sentencing power vested in the judge protects the defendant against an improper sentence to death. The Court rejected that argument: "Again, we are not persuaded that sentencing by the judge compensates for the risk that the jury may return an improper verdict because of the unavailability of a 'third option.'" 447 U.S. 625, 100 S.Ct. 2382. That rejected argument—that the sentencing power of the judge is a cure—has risen from the grave in this case and has been accepted by the district court. And, anomalously, the basis for that incorrect acceptance is *Rembert,* which did not concern the power of the judge but the power of the jury itself to avoid or temper the risks of "all-or-nothing."

The jury that convicted Rembert operated under constraints that were significantly less restrictive than the ones pressuring the jury in *Beck.* The factfinding process in the present case was virtually identical to that in *Beck.* We are unable to say that the constitutional error in Wiggerfall's conviction was harmless.

Of course, "due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." *Hopper v. Evans,* 456 U.S. 605, 611, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 (1982) (emphasis in original). As in *Beck,* Wiggerfall was indicted and tried under the "[r]obbery or attempts thereof, when the victim is intentionally killed by the defendant" prong of the murder statute. § 13–11–2(a)(1); *Beck,* 447 U.S. at 627, 100 S.Ct. at 2384. As the Supreme Court noted, at the time Wiggerfall was tried felony murder was a lesser included noncapital offense of intentional killing during a robbery. *Beck,* 447 U.S. at 628 & n. 2, 100 S.Ct. at 2385 & n. 2; Ala.Code §§ 13–1–70, 13–11–2(b) (1975). Our review of the trial transcript indicates that the evidence warranted instructing the jury on this offense.[5]

---

5. It appears no finding has been made on this issue in either the state courts or the federal district court. However, it is unnecessary to remand to the district court on this issue. The trial transcript is a part of the record on appeal, and no further factual development can take place on this issue. Therefore, we are in as good a position as the district court to make this determination. In any event, this is a familiar duty of federal appellate courts: determining whether "the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater." *Evans,* 456 U.S. at 612, 102 S.Ct. at 2053 (brackets in

We REVERSE the judgment and RE-MAND to the district court with directions to grant the writ subject to the right of the State to retry Wiggerfall within a reasonable time.

original) (quoting *Keeble v. United States,* 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1973)); *cf. U.S. v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983) (standard of appellate review of sufficiency of evidence to support conviction).