**Revised January 13, 1999**

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 97-50606

_____


LYNN MURPHY CREEL,


                    Petitioner-Appellant,

versus


GARY L. JOHNSON, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,


                    Respondent-Appellee.

_____

Appeal from the United States District Court
for the Western District of Texas
_____

December 23, 1998

Before POLITZ, Chief Judge, EMILIO M. GARZA, and STEWART, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Lynn Murphy Creel appeals the district court's denial of his petition for habeas corpus relief under 28 U.S.C. § 2254. A Texas jury convicted Creel of capital murder and sentenced him to life imprisonment. He argues that the district court erred in ruling (1) that a lesser-included-offense instruction was not warranted; (2) that undisclosed perjury of a witness was not material to his

case; (3) that the state did not violate his Sixth Amendment right to counsel; (4) that an evidentiary hearing should not be held on his claim of actual innocence; and (5) that his trial counsel did not render ineffective assistance.  We affirm.

I

Creel met Wilson Smith ("Smith"), the man whom Creel was later convicted of murdering, through Irene Plangman.  Plangman had become acquainted with Mrs. Joan Smith ("Joan") through business dealings, and Plangman lived briefly with the Smiths.  During that time, Plangman and Creel were sexually intimate.  Creel sold Joan some jewelry, and Plangman acted as an intermediary in the transaction.  When Joan was unable to raise the purchase price, Creel became angry over the sale and Plangman's friendship with the Smiths.  Creel contacted Julie Woodley about posing as a potential buyer for some property that the Smiths had for sale.  According to Woodley, Creel wanted to talk to the owners about money owed to him.  Woodley arranged by telephone for Smith to meet her, and then called Creel to tell him of the arrangement.  The next morning, Smith left to meet the potential buyer; Joan never saw Smith again.

Creel arrived later that day at Plangman's house and told her he had Smith in his van.  He wanted her assistance and advice in deciding what to do with Smith.  When Plangman expressed disbelief, Creel declared he "would handle things himself."  At Plangman's suggestion that he let Smith go, Creel responded that

-2-

he, "wasn't going to spend the rest of his life in jail for kidnaping someone and then [having the victim] talking about it later." When Creel called Plangman the next day he told her, "Well it's all over. It's finished." Creel remarked, "what happened to a person as they got older, did they just give up the fight to live, or did they just not care, or did they just become hard and--refused to fight for life."

While borrowing the van a few days later, Plangman found some of Smith's jewelry and belongings in a side pocket. When questioned about the jewelry, Creel stated he intended to sell it. An employee at a local jewelry store, Charles Goodnough, testified that Creel sold him a ring similar to one Smith was wearing when he disappeared.

Joan reported Smith's disappearance and gave Adolpho Cuellar, a Texas Ranger, the names of Plangman and Creel as possible suspects. Cuellar interviewed Plangman, who became his chief source of information. Plangman related the jewelry discovery to Cuellar the day after it occurred.

Others testified against Creel. Randal Graham testified that prior to Creel's arrest, Creel stated, "I've killed a man and I've got his body in the back of the van, and I need you to help me get rid of it." Graham's wife Catherine corroborated this testimony. The Grahams left, declining to aid Creel.

After Medina County charged Creel with aggravated kidnapping and aggravated robbery, Plangman disclosed communications she had

with Creel while he was incarcerated. Plangman testified that Creel's letters to her contained coded instructions on how to dispose of Smith's body. Creel received information from his cell mate, Jay Martinez, regarding the appropriate mix of acids to dissolve a body. Creel then directed Plangman to give a friend of his, David Wolf, information on buying acids to dissolve the body. Wolf testified that Plangman attempted twice to give him maps, reportedly from Creel, that led to the body. He looked at the second map briefly before throwing it away. In response to Cuellar's repeated requests for the location of Smith's body, Plangman insisted she did not know.

The Medina County Grand Jury returned indictments for aggravated robbery and aggravated kidnaping of Smith. At a meeting the next day, Cuellar questioned Plangman about the body's location and Plangman said, "Let's just drive." She directed Cuellar to a rural residence in disrepair in Bexar County and suggested the possibility that the body was buried there. She told Cuellar she led him there because she had been there with Creel. Cuellar returned the next day and found Smith's body in a barn. Plangman also returned the next day and, upon hearing that Cuellar found Smith's body, said, "I did it." She testified later that her statement was caused by the emotional stress and shock of finding the body.

The chief medical examiner testified about the results of the autopsy on Smith's body, which was identified by his

-4-

dentures.  Smith's severely decomposed body did not reveal trauma such as bullet holes or fractures.  Silver-colored duct tape covered the mouth but not the nose area; however, rodents had eaten the nose, making it impossible to know whether the tape originally covered all breathing passages.  Removing the duct tape revealed a knotted red cloth wedged in the mouth.  Based on the state of decomposition, the examiner testified that the body had been buried for months.

The medical examiner expressed the opinion that the manner of death was "homicide," based upon the fact that the person was bound, the mouth was stuffed with a gag, and the hands and feet were tied and bound.  Although the autopsy revealed that Smith suffered from moderate coronary artery disease and the examiner admitted it was possible that heart failure caused the death, the examiner insisted he would still classify the death as a homicide.  According to the examiner, the gag in the mouth was more dangerous than the duct tape, because a gag typically works its way back to block the airway and eventually causes death by choking.

A jury convicted Creel of capital murder in the 144th District Court of Bexar County, Texas.  At the sentencing phase of trial, the jury sentenced Creel to life imprisonment.  After his conviction was affirmed on direct and state collateral review, Creel filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254.

A magistrate held an evidentiary hearing on five of Creel's alleged grounds for relief. Much of the evidence concerned Plangman. Cuellar testified Plangman had begun acting as an informant six days before Creel's arrest, and that, although Cuellar did not instruct Plangman to obtain information, he was hopeful she would supply it to him. Creel testified that when he was in jail Plangman urged him to write her letters. Creel argued Plangman assisted Cuellar in finding Woodley in exchange for Cuellar's help in getting the jewelry returned from Joan. Creel testified he did not know Plangman provided information to Cuellar until Cuellar later named her as an informant at a court hearing.

Creel also presented newly discovered evidence of his alleged innocence. Creel proffered evidence that Smith had signed a document transferring title to a car after Creel had been arrested. Creel argued that, because he was in jail, he could not have killed Smith.

The district court adopted the magistrate's recommendation to deny habeas. Creel appeals this denial, having obtained a Certificate of Probable Cause ("CPC") from the district court.[1]

---

[1] The Antiterrorism and Effective Death Penalty Act ("AEDPA") is inapplicable to Creel's case, because he filed his first petition for habeas relief prior to April 24, 1996, the effective date of the AEDPA. *See Lindh v. Murphy*, 521 U.S. 320, __ , 117 S. Ct. 2059, 2063, 138 L. Ed. 2d. 481 (1997). We apply pre-AEDPA law to his claims. *See Green v. Johnson*, 116 F.3d 1115, 1120 (5th Cir. 1997).

In considering a federal habeas corpus petition by a prisoner in state custody, federal courts must generally accord a presumption of correctness to any state court factual findings. *See Mann v. Scott*, 41 F.3d 986, 973 (5th Cir. 1994)(citing 28 U.S.C. § 2254(d)). We review the district court's findings of fact for clear error, but decide questions of law *de novo*. *See id.*

II

Creel argues that the district court erred in finding he was not entitled to a lesser-included-offense instruction. The state trial court denied Creel's request for an instruction on the lesser included offense of felony murder, which differs from capital murder in that felony murder does not require the prosecution to prove an intent to kill. *See Creel v. State*, 754 S.W.2d 205, 211 (Tex. Crim. App. 1988)(en banc)(explaining capital and felony murder differ only in culpable mental state). *Compare* TEX. PENAL CODE ANN. § 19.03(a)(2)(West 1994)(capital murder), *with* TEX. PENAL CODE ANN. § 19.02(b)(3) (felony murder).

Creel argues that due process requires that juries in capital murder cases receive a lesser included offense instruction when it is supported by the evidence. Creel cites *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), which held invalid a provision of the Alabama death penalty statute that precluded a jury instruction on a lesser included noncapital offense. The statute forced the jury either

-7-

to convict, in which case the death penalty was imposed automatically, or to acquit, in which case the defendant would escape all penalties. *See id.* at 628-29, 100 S. Ct. at 2385. The Court stated that the failure to give the jury the "third option" of convicting on a lesser included offense decreases the reliability of the verdict, because when "the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction." *Id.* at 634, 100 S. Ct. at 2388 (quoting *Keeble v. United States*, 412 U.S. 205, 213, 93 S. Ct. 1998, 1995, 36 L. Ed. 2d 844 (1973)). This risk "cannot be tolerated in a case in which the defendant's life is at stake." *Id.* at 637, 100 S. Ct. at 2389.

We have applied *Beck* to cases in which a state trial court refuses a lesser-included-offense instruction.[2] *See Cordova v. Lynaugh*, 838 F.2d 764, 767 (5th Cir. 1988). *Beck* itself endorsed

---

[2] The State argues that Creel relies mistakenly on *Beck*, because in *Livingston v. Johnson,* 107 F.3d 297, 313 (5th Cir.), *cert. denied,* __ U.S. __, 118 S. Ct. 204, 139 L. Ed. 2d 141 (1997), we held that *Beck* does not apply to the Texas sentencing scheme. Although the trial court in *Livingston* instructed the jury on capital murder and the lesser included offense of murder, Livingston challenged the trial court's failure to instruct additionally on felony murder. We rejected Livingston's challenge because the jury had a "third option": to convict on the lesser included offense of murder. We did not extend *Beck*, which was concerned with the all-or-nothing scheme, to cases in which the defendant did have the benefit of a third option. *See id.* at 313 (citing *Allridge v. Scott*, 41 F.3d 213, 220 (5th Cir. 1994)(stating *Beck* inapplicable when jury had option to choose murder over capital murder)). *Livingston* is inapposite because the jury that convicted Creel did not have a third option to consider.

no particular standard under which a court must give a lesser-included-offense instruction. *See Reddix v. Thigpen*, 805 F.2d 506, 511 (5th Cir. 1986)("The *Beck* Court . . . appeared to accept the variation in standards.")(citation omitted). However, in *Cordova* we equated the standards described approvingly in *Beck* with the standard used in federal trials. *See Cordova*, 838 F.2d at 767 ("[W]e conclude that the federal standard . . . is equivalent to the *Beck* standard that a lesser included instruction must be given when the evidence would have supported such a verdict."). The federal rule, "that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater," comports with federal due process. *Beck,* 477 U.S. at 635, 100 S. Ct. at 2388 (citation omitted).

Creel maintains that the trial evidence supported the "third option" of an instruction for felony murder. Creel argues that a jury could rationally convict him of felony murder and acquit him of capital murder, because the evidence is consistent with accidental death and does not establish intent to kill Smith. He points to the autopsy report that indicates heart failure as a possible cause of death, the absence of tape on Smith's nose, and the possible use of the gag to quiet Smith, rather than to kill him. He states his comment to the Grahams that "he killed a man"

does not establish it was intentional, and that his comments to Plangman were inconclusive due to their vagueness. He argues that, because a jury could acquit him of capital murder, he was entitled to an instruction on the "third option" of felony murder.

The State argues that, because Creel is sentenced to life imprisonment rather than death, we should treat the case as a non-capital case. The cases since *Beck* in which we have considered entitlement to a lesser-included-offense instruction have been "purely" capital cases in which a jury convicted a defendant *and* sentenced him to death. *See, e.g., Linceum v. Collins*, 958 F.2d 1271, 1273, 1275 (5th Cir. 1992); *Cordova*, 838 F.2d at 766. This case presents, therefore, the novel issue of whether a case in which a defendant who initially faces capital charges, but is ultimately sentenced to life imprisonment, should be classified as capital or non-capital for *Beck* purposes.[3]

---

[3] Creel contends we should not review this issue because the State did not argue it to the district court. We resolve the issue because uncertainty exists with respect to a pure question of law. *See Singleton v. Wulff*, 428 U.S. 106, 121, 96 S. Ct. 2868, 2877, 49 L. Ed. 2d. 826 (1976)("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the court of appeals, to be exercised on the facts of individual cases."); *Roosevelt v. E.I. Du Pont de Nemours & Co.,* 958 F.2d 416, 419 n.5 (D.C. Cir. 1992)(citation omitted) (noting discretion will be exercised in circumstance of uncertain state of the law). This purely legal uncertainty distinguishes this case from those in which we apply plain error review to the issues presented first to the appellate court. *See* Rhett R. Dennerline, "Pushing Aside the General Rule in Order to Raise New Issues on Appeal," 64 Ind. L.J. 985, 999 (1989)(explaining how

Several circuits classify cases in which the death penalty is sought, but not imposed, as noncapital cases. *See Pitts v. Lockhart*, 911 F.2d 109, 112 (8th Cir. 1990) (finding case should be treated as noncapital case for purpose of due process); *Trujillo v. Sullivan*, 815 F.2d 597, 602 (10th Cir. 1987)(same). The concerns in *Beck*, that a defendant should not be sentenced to death automatically if a jury cannot convict on a lesser offense, are absent in cases in which the death penalty is not imposed ultimately. These cases do not implicate directly the Eighth Amendment's prohibition on cruel and unusual punishment, which courts interpret to require greater procedural safeguards in capital cases. *See Trujillo*, 815 F.2d at 601, 602 (stating Eighth Amendment values not implicated). Creel did not receive the death sentence, and therefore his case is analytically more similar to a noncapital case.

Creel urges us to treat his case as a capital one because the judge must decide, before any sentence is imposed, whether to instruct on a lesser included offense. The imposition of a life sentence, Creel contends, does not change the nature of the case at the stage where the jury determines guilt. We reject Creel's

---

characterizing an issue as one of "pure law," which raises a new theory, differs from characterizing it as "plain error," which alleges trial error to which there was no objection, but could be clearly resolved); *cf. United States v. Calverley*, 37 F.3d 160, 163 (5th Cir. 1994) (en banc) (holding plain error review appropriate where the error was clear under current law at the time of trial).

argument. The only circuit to treat these cases as capital cases, as Creel urges, also performs a harmless-error analysis. S*ee Rembert v. Dugger*, 842 F.2d 301, 303 (11th Cir. 1988) (treating these cases as capital cases). In *Rembert*, because "[t]he danger of an unwarranted death sentence ended when Rembert was given life," the court concluded that the constitutional error was rendered harmless. *Id.* at 303. Creel received a life sentence under a bifurcated sentencing scheme. Thus, even if we were to consider the case a capital one, any error would be harmless. *See Wiggerfall v. Jones*, 918 F.2d 1544, 1549-50 (11th Cir. 1990) (explaining that when defendant receives life sentence pursuant to bifurcated sentencing scheme, error in failing to instruct on lesser included offense is harmless).

We hold that a case in which the death penalty is sought but not imposed ultimately is classified as a noncapital case for the purposes of a *Beck* analysis. "In a non-capital murder case, the failure to give an instruction on a lesser included offense does not raise a federal constitutional issue." *See Valles v. Lynaugh*, 835 F.2d 126, 127 (5th Cir. 1988); *Alexander v. McCotter,* 775 F.2d 595, 601 (5th Cir. 1985)(holding lesser included offense instruction is not a federal constitutional matter in non-capital cases). The Texas Court of Appeals concluded that the evidence did not support instruction on felony murder. Absent a violation of the Constitution, we defer to the

state court interpretation of its law for whether a lesser-included-offense instruction is warranted. *See Valles,* 835 F.2d at 128.

                                    III

Creel alleges that the state used perjured testimony when it allowed Plangman to testify that she lacked knowledge of the body's location prior to when it was found. A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *See Giglio v. United States,* 405 U.S. 150, 154, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177, 3 L. Ed. 2d 1217 (1959). The defendant must show that (1) the testimony was false, (2) the state knew it was false, and (3) the testimony was material. *See Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993). This test presents a mixed question of law and fact, and thus we review the underlying facts for clear error and the conclusions from the facts *de novo*. *See Ornelas v. United* States, 517 U.S. 690, 699, 116 S. Ct. 1657, 1663, 134 L. Ed. 2d 911 (1996); *United States v. O'Keefe*, 128 F.3d 885, 894 (5th Cir. 1997), *cert. denied*, )) U.S. )), 118 S. Ct. 1525, 140 L. Ed. 2d 676 (1998).

Creel argues that Plangman testified falsely at trial that she did not know the location of the body, and that the state knew the falsity of the testimony. Cuellar's police progress

report, which Creel obtained after his conviction, is "hardly a font of clarity or consistency," as the district court acknowledged. The report states: "She was asked if she knew where the body was and she stated she had no idea where it might be and she refused to tell. She further stated that she had learned it's [sic] location just recently by taking messages to David Wolf from Lynn Creel who is in jail." Creel argues that the report evidences Plangman's perjury, and that, on direct examination at trial, prosecutors elicited testimony in which Plangman denied knowing the body's location prior to when the police discovered the body.

The State responds that, even though Plangman testified falsely, it did not knowingly use perjured testimony. Former Bexar County Assistant District Attorney Raymond Fuchs, one of the members of the prosecution team, testified at the federal evidentiary hearing that they were concerned that Plangman was not a credible witness. He found her explanation that a lucky guess enabled her to direct Cuellar to the body almost "preposterous" and "awfully peculiar." Fuchs testified further that, although Plangman was unresponsive to questions, he knew of no evidence that she committed perjury at trial. Although there is no evidence that the prosecutors in this case had seen Cuellar's report, Cuellar testified that he prepared the report and placed it in his file. This serves to create constructive

-14-

notice of the contents of the file.  *See United States v. Miranne*, 688 F.2d 980, 989 (5th Cir. 1982) (considering whether notice, actual or constructive, of perjury could be attributed to the government).

To find a violation of due process, however, the perjury must have been material to Creel's conviction.  "The mere *possibility* that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."  *United States v. Agurs*, 427 U.S. 97, 109-10, 96 S. Ct. 2392, 2400, 49 L. Ed. 2d 342 (1976)(emphasis added).  Perjury is material, and a new trial is required, if "'there is any *reasonable* likelihood that the false testimony could have affected the judgment of the jury.'" *Kirkpatrick*, 992 F.2d at 497 (citing *Agurs*, 427 U.S. at 103, 96 S. Ct. at 2397 (footnote omitted))(emphasis added); *Giglio,* 405 U.S. at 154, 92 S. Ct. at 766.

Creel advances two principal reasons that Plangman's perjury was material.  Creel alleges first that, if the perjury had been disclosed, it would have affected Plangman's credibility as a key witness.  Plangman's testimony regarding whether she knew the body's location was not probative that Creel murdered Smith, and there was no genuine dispute at trial about the circumstances surrounding the discovery of the body.  *See United States v.*

-15-

*Washington*, 44 F.3d 1271, 1282 (5th Cir. 1995)(finding that whether perjurious statements concern a completely collateral matter unrelated to defendant's guilt is important to materiality).  In addition, the jury had the opportunity to observe Plangman and Cuellar while each was cross-examined extensively.  As the district court noted, "Plangman's trial testimony on this and many other points were internally inconsistent, contradicted by the testimony of other prosecution witnesses, and, in many instances, wholly unworthy of belief." The impeachment evidence would have been cumulative in nature and the jury's impression of Plangman's credibility probably would not have changed upon learning of the perjury.  Further, the testimony of many witnesses complements Plangman's testimony regarding the issue of Creel's guilt.  Martinez testified that Creel asked him repeatedly for information on dissolving a human corpse with acid.  The state presented Creel's letters to Plangman.  The Grahams testified that Creel stated he killed a man and needed help disposing of the body.  Woodley testified that she set up the meeting with Smith pursuant to Creel's request.  Goodnough testified that Creel sold him a ring similar to Smith's.  Considering the independent evidence of Creel's guilt, we cannot say that the jury's judgment would have been affected had the defense possessed further evidence that could have been used to impeach Plangman.

-16-

Creel alleges second that the perjury was material because disclosing the perjury could have convinced the jury that Plangman was the murderer and that she lied to frame Creel.[4] Creel suggests this theory best explains Plangman's utterance of "I did it" upon the discovery of the body. Based on Plangman's explanation that she made this utterance in shock, and the substantial circumstantial evidence from the other witnesses, there is not a reasonable likelihood that the jury would have acquitted Creel, believing that Plangman committed the murder. Further, if the jury believed the police report, then they would believe merely that Plangman learned the body's location from Creel's letters, and not that she framed Creel.

We find that there does not exist a reasonable likelihood that Plangman's perjury could have affected the judgment of the jury. See *Kirkpatrick*, 992 F.2d at 497. Whether Plangman actually knew of the body's location is a collateral matter and does not bear directly on Creel's guilt. The state presented substantial other circumstantial evidence that established Creel's guilt and that corroborated much of Plangman's testimony. The perjury is unlikely to have changed the jury's impression of

---

[4] We reject also Creel's contention that we consider the perjury in light of what a skilled lawyer would have done with the evidence. *See Agurs*, 427 U.S. at 113 n.20, 96 S. Ct. at 2402 (rejecting standard of materiality that focuses on the impact that undisclosed evidence would have on defendant's ability to prepare for trial).

-17-

Plangman's general tendency to veracity. We conclude that the state's knowing use of Plangman's perjured testimony did not violate due process because the testimony was not material to Creel's conviction.

IV

Creel contends that Plangman, acting as an agent of the state, obtained incriminating information from Creel in violation of his Sixth Amendment right to counsel. The district court ruled that Plangman did not act as an agent of the state and that it was not error to introduce information she had received from Creel. We have yet to address the standard of review for determining whether a person is an informant or agent under the Sixth Amendment. Some courts consider the determination a factual one. *See United States v. Malik*, 680 F.2d 1162, 1165 (7th Cir. 1982); *United States v. Van Scoy*, 654 F.2d 257, 260 (3d Cir. 1981). Other courts review for clear error only the factual determination of the relationship or understanding between the police and informant. These courts review *de novo* whether the relationship, as found by the district court, is such that the informant's questioning is considered government interrogation for constitutional purposes.[5] *See United States v. Johnson*, 4

_____

[5] The state habeas court made no factual findings on this issue, and so 28 U.S.C. § 2254(d) is inapplicable. Creel alleges the district court's ruling on the claim is open to plenary review; however, we review the district court's fact findings for clear error.

F.3d 904, 910 (10th Cir. 1993); *United States v. Surridge*, 687 F.2d 250, 252 (8th Cir. 1982). We find it unnecessary to decide which standard to apply because, regardless of which standard we use, Plangman was not an agent of the government.

In *Massiah v. United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 1203, 12 L. Ed. 2d 246 (1964), the Supreme Court held that the accused has a Sixth Amendment right to be free of questioning by an undisclosed government agent without counsel being present. The Sixth Amendment is implicated whenever government agents "deliberately elicit[]" incriminating statements after indictment and in the absence of counsel. *Id*. To prove a Sixth Amendment violation, Creel must prove (1) that Plangman was a government agent, and (2) that Plangman "deliberately elicited" incriminating statements from Creel.

Before we consider whether Plangman "deliberately elicited" statements from Creel, we must find, apart from Plangman's status as an informant, that she acted as a government agent. *See, e.g., United States v. Taylor*, 800 F.2d 1012, 1015 (10th Cir. 1986)(holding Sixth Amendment inapplicable to statements made to informant who is not an agent). The district court created a two-pronged test for determining whether an agency relationship existed, requiring the defendant to show that the informant: (1) was promised, reasonably led to believe, or actually received a benefit in exchange for soliciting information from the

-19-

defendant; and (2) acted pursuant to instructions from the State, or otherwise submitted to the State's control.

Creel objects to the test, asserting that each prong is contrary to Supreme Court precedent.  According to Creel, *Maine v. Moulton*, 474 U.S. 159, 176, 106 S. Ct. 477, 487, 88 L. Ed. 2d 481 (1985), stands for the principle that, instead of requiring a *quid pro quo*, the relevant determination should be whether the State made an arrangement to obtain information from the accused prior to when the informant contacted the accused.  *See id.* at 176, 106 S. Ct. at 487 ("[I]t is clear that the State violated Moulton's Sixth Amendment right when it arranged to record conversations.").  Creel's reliance on *Moulton* is misplaced because *Moulton,* which involved a clear case of agency, addressed the different issue of whether the prohibition on using undisclosed agents to "deliberately elicit" information extended to where the accused initiates contact with the agent.  Creel objects also to the second prong, which requires us to consider whether the state controlled Plangman.  Instead, citing to *United States v. Henry*, 447 U.S. 264, 272 n.10, 100 S. Ct. 2183, 2187, 65 L. Ed. 2d 115 (1980), Creel argues that we should consider whether Plangman "was charged with the task of obtaining information from an accused."   *Henry* involved also a clear case of agency, and the Court only considered if the agent were "charged with the task of obtaining information from an accused"

to determine whether the agent "deliberately elicited" the information.  Creel's objections both fail for the same reason, namely that the agency inquiry is precedent to and distinct from determining whether an agent "deliberately elicits" information.

Having disposed of Creel's specific objections to the test, we address whether Plangman can be considered a government agent under the first prong, a *quid pro quo* agreement.  Plangman is a State agent, Creel argues, because Plangman received benefits in exchange for her aid to Cuellar.  Specifically, the authorities never prosecuted Plangman and, in exchange for Woodley's name, Plangman received Cuellar's help in retrieving jewelry from Joan.  Creel presented no evidence, however, that anyone promised Plangman not to pursue charges in exchange for her assistance or testimony.  The district court found further that no credible evidence existed that Cuellar undertook to return the jewelry in exchange for Plangman's agreement to solicit incriminating evidence.  No credible testimony existed regarding when Plangman first learned Woodley's name or that she learned of Woodley from Creel.  The district court notes that Creel's counsel stated in a pretrial motion that Cuellar had secured information establishing Woodley's identity during a search a Creel's residence.

Creel alleges Plangman received other benefits in exchange for her assistance.  Plangman testified at trial that she had romantic liaisons with Cuellar.  Cuellar denied the sexual

-21-

involvement, and testified that Plangman told him that she had fabricated the story. Plangman testified at trial that she received conjugal visits with Creel in jail, as a result of special leniency in visitation rules. Prison officials testified that Plangman's visits with Creel were supervised. Creel admitted that his letters to Plangman contradict his testimony regarding the dates on which he had sexual relations with Plangman. The district court found the testimony regarding Plangman's involvement with Cuellar and the conjugal visits with Creel to be "wholly incredible."

The district court found no credible testimony or other evidence that the government promised or gave Plangman a benefit in exchange for soliciting statements from Creel. Creel presented no evidence that Plangman's motivation was anything other than her desire to assist in locating the decedent's body. Thus, considering the evidence presented at the federal evidentiary hearing, the district court's factual finding on the first prong, that Plangman was not promised and did not receive a benefit, was not clearly erroneous.

We consider next whether Plangman is an agent under the second prong, that is, whether Plangman acted pursuant to instructions from the State, or otherwise submitted to the State's control. Creel argues that Cuellar began directing Plangman when, in response to her offer to bring Creel's van for Cuellar to search, Cuellar told her that he would instead use her

information to obtain a warrant to search Creel's house.  Creel alleges that, on the day of Creel's arrest, Cuellar asked Plangman to go to Creel's house to "see if [she] could find the . . . jewelry" belonging to Smith.  These incidents cannot be considered Sixth Amendment violations because they occurred prior to Creel's arrest when he invoked his Sixth Amendment right to counsel.  *See United States v. Howard*, 991 F.2d 195, 201 (5th Cir. 1993)("No judicial proceeding had been initiated against Howard, therefore, he had no right to counsel under the Sixth Amendment.").

Creel argues also that Plangman became an agent when she helped Cuellar locate Smith's body.  Plangman testified that one of her reasons for visiting Creel was to "help seek any information to find the body."  Yet, the fact that Plangman wanted to help the police to solve a murder case does not necessarily make her an agent for Sixth Amendment purposes.  *See Malik*, 680 F.2d at 1165 (refusing to extend agency to individual acting on own initiative); *cf. Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S. Ct. 2022, 2048, 29 L. Ed. 2d 564 (1971) (stating individual not an agent for Fourth Amendment if she acted wholly on her own initiative).  Plangman also said that an officer told her that she "was the nearest one to [Creel], and if anyone could get the information, [she] could."  The district court found that this statement did not constitute direction by

-23-

the government.  The fact that Plangman learned of the body's location and disclosed it to the government in no way indicates that the State directed or controlled her in learning of that information.  Thus, the finding of the district court, that no credible testimony existed to establish that the government directed Plangman, was not clearly erroneous.

On the facts of this case, Plangman was not a government agent.  Creel failed to meet the two-pronged test formulated by the district court.[6]  Plangman did not receive, nor was she promised, any benefits in exchange for eliciting information from Creel.  Plangman acted at her own discretion in her dealings with Creel.  In the absence of a *quid pro quo* between Plangman and Cuellar, and in the absence of instruction or control by the State, we hold that Plangman was not a government agent.  Even if Plangman had "deliberately elicited" incriminating information from Creel, his right to counsel was not violated because she was not an agent of the state.  *See Massiah*, 377 U.S. at 206, 84 S. Ct. at 1203.

V

Creel alleges that the district court should have extended the federal evidentiary hearing to include his claim of actual innocence based on newly discovered evidence.  Irrespective of

---

[6]  We decline to address whether a defendant must prove both prongs of the test, because Creel failed to prove either prong.

whether a case is capital or noncapital, we have reaffirmed that newly discovered evidence of innocence, "absent an independent constitutional violation occurring in the underlying state criminal proceeding," is not a ground for habeas relief. *Jacobs v. Scott,* 31 F.3d 1319, 1324 (5th Cir. 1994)(quoting *Herrera v. Collins*, 506 U.S. 390, 400, 113 S. Ct. 853, 860, 122 L. Ed. 2d 203 (1993)). The district court correctly denied Creel an evidentiary hearing on this issue because *Jacobs* forecloses Creel's argument.

                                    VI

Creel argues lastly that the district court erred in finding that his trial lawyer Charles Conaway was not ineffective. In order to prove ineffective assistance of counsel, Creel must show that (1) Conaway's representation "fell below an objective standard of reasonableness" and (2) that the performance resulted in actual prejudice. *Strickland v. Washington*, 466 U.S. 668, 689, 692, 104 S. Ct. 2052, 2055, 2067, 80 L. Ed. 2d 674 (1984). Both prongs of the *Strickland* test present a mixed question of law and fact. We review independently whether counsel's representation passes constitutional muster. We apply the § 2254(d) presumption of correctness to factual findings of the state courts and review factual findings of the federal court for clear error. *See Mattheson v. King*, 751 F.2d 1432, 1438 (5th Cir. 1985).

Creel contends first that Conaway rendered ineffective assistance because he failed to raise a jurisdictional defect. Medina County indicted Creel on kidnaping and robbery charges; after the police discovered Smith's body in Bexar County, Creel was indicted and convicted of capital murder in Bexar County. The Texas Code of Criminal Procedure provides that "[w]hen two or more courts have concurrent jurisdiction of any criminal offense, the court in which an indictment or a complaint shall first be filed shall retain jurisdiction." TEX. CODE CRIM. P. ANN. art. 4.16 (West 1977). Conaway failed to move to dismiss the Bexar County proceedings on the ground of Medina County's priority of jurisdiction, which operated as a waiver of the jurisdictional defect. *See Reynosa v. Segall*, 780 S.W.2d 884, 888 (Tex. Ct. App.))El Paso 1989, no pet.)("[T]he accused may file for and insist on action by the originating court."); *Mills v. State*, 742 S.W.2d 831, 835 (Tex. Ct. App.))Dallas 1987, no pet.)("A defendant who does not interpose a plea to the jurisdiction may waive the right to question jurisdiction under article 4.16."). Creel argues that Conaway's failure to move to dismiss constituted ineffective assistance of counsel.

To determine whether Conaway provided ineffective assistance, we must decide whether the jurisdictional waiver was prejudicial. *See Strickland,* 466 U.S. at 697, 104 S. Ct. at 2069 ("If it is easier to dispose of an effectiveness claim on the

-26-

ground of lack of sufficient prejudice . . . that course should be followed.").  To prove prejudice, Creel must show that (1) there is a reasonable probability that, but for counsel's errors, the ultimate result of the proceeding would have been different, *see id.* at 694, 104 S. Ct. at 2068, and (2) that counsel's deficient performance rendered the trial fundamentally unfair, *see Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 844, 122 L. Ed. 2d 180 (1993).

Conaway's failure to move to dismiss could not have affected the proceedings because the charges in Medina and Bexar County were not for the same offense, which renders Article 4.16 inapplicable.  Creel argues that the kidnaping and robbery charges should be considered lesser charges of the capital murder charge, and that double jeopardy would have barred his capital prosecution in Bexar County under Article 4.16.  Texas courts interpret the statute differently:

> [W]e are not here dealing with a question of double jeopardy . . . .  Article 4.16 refers to courts having concurrent jurisdiction 'of any criminal offense' as opposed to jurisdiction of the transaction out of which several offenses may develop.

*Flores v. Texas,* 487 S.W.2d 122, 126 (Tex. Crim. App. 1972).  We defer to this interpretation of the statute.  *See Weeks v. Scott*, 55 F.3d 1059, 1063 (5th Cir. 1995)("[W]e defer to the state court's interpretation of the Texas . . . statute.").  Conaway could not have succeeded in a motion to dismiss under Article

4.16, because kidnaping and robbery are different offenses than capital murder. Thus, we find that Creel has not shown that, had Conaway moved to dismiss, the proceedings would have been different or that, absent that motion, his trial was fundamentally unfair.

Creel alleges that Conaway's failure to investigate evidence of Creel's innocence also rendered his assistance ineffective. He cites Conaway's failure to investigate the bankruptcy of a company owned by Smith. When Creel investigated the company later,[7] he discovered evidence indicating that someone had signed Smith's name to a truck title while Creel was incarcerated. Creel argues that the evidence proves his innocence because it proves that Smith was killed while Creel was in jail. The evidence does not establish, however, that Smith personally signed the truck title on that date. Creel has not shown how investigating Smith's bankruptcy would have benefitted his defense, because the evidence does not exculpate him. *See United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)(stating defendant must prove how investigation would have altered outcome of trial). Moreover, the facts at trial point overwhelmingly to Creel's guilt, so that even the most competent attorney would be

---

[7] Creel has explained that, while in jail, he located a San Antonio Police Department report pertaining to a theft of one of Smith's business vehicles. This led Creel to seek a certified Texas title history of the truck.

unlikely to have obtained an acquittal.  *See Wilkerson v. Whitley*, 16 F.3d 64, 68 (5th Cir. 1994)(stating ineffectiveness claim fails if most competent attorney could not obtain acquittal due to abundance of evidence).

We cannot say the attorney rendered ineffective assistance. Creel has not proven the objective unreasonableness of Conaway's actions or that they prejudiced him.  The district court correctly denied Creel's claim.

VII

We AFFIRM all rulings of the district court.