# NO. 12-23-00310-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *JOSHUA  RAY TIBBITS,*<br>*APPELLANT* | § | *APPEAL FROM THE 114TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *SMITH COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Appellant, Joshua Ray Tibbits, challenges his conviction for engaging in organized criminal activity.  In four issues, he challenges the sufficiency of the evidence and the trial court's denial of requested jury instructions.  We affirm.

## BACKGROUND

On the afternoon of May 2, 2020, Frances Pence was gardening in her back yard on FM 850 in Smith County, Texas when she heard the sound of an approaching motorcycle, followed by five popping sounds, which she believed were caused by a mechanical problem with the motorcycle.  Between five and fifteen minutes later, she noticed cars stopped in front of the house, and went to the front yard.  Pence observed a man laying down and a motorcycle, and initially assumed he hit the speed limit sign in front of the house.  She later learned, through conversations with law enforcement, that the man was not injured in a traffic accident.

On the same afternoon, Gail Harper, then employed as a nursing assistant, was traveling by car with her father on FM 850 when she heard multiple gunshots.  Shortly thereafter, Harper and her father encountered a man wearing a motorcycle helmet lying face down on the side of the road.  Harper stopped to help and called emergency services.  When Harper turned the man

over to assess his condition, she noted that he had been shot but was still breathing; she recalled seeing two gunshot wounds to his upper chest. The man began coughing up blood and "shivering or shaking." Harper unsuccessfully attempted to locate the man's wallet to identify him.

Detective Lauren Fite of the Smith County Sheriff's Office was dispatched to the scene. The victim, Brandon Edwards, had what Fite identified as a gunshot wound and was already deceased.[1] She noted that he wore a leather vest with a three-piece "cut" on the back, which she defined as a set of patches serving as "an identifier as to what motorcycle club or gang that they belong to." Edwards's vest had patches reading "Cossacks," "Texas," and "1%," as well as a patch reading "Sergeant at Arms." Detective Fite found multiple cartridge casings from both .40 caliber and 9mm bullets on and beside the roadway. She recovered both a lead fragment and a copper jacket from the back of Edwards's helmet, which indicated that a bullet struck the helmet and became lodged inside but did not reach Edwards. Later, Edwards's family contacted Fite to report that they found a 9mm bullet lodged in the front tire of the motorcycle.

Investigator Aneas Sutton, also of the Smith County Sheriff's Office, interviewed Eric Burnham (then a member of the same "1% Cossacks" motorcycle club to which Edwards belonged), at the crime scene on May 2. Burnham stated that the 1% Cossacks and another motorcycle club, the "Ugly Man Cossacks" (UMC) were previously part of one "Cossacks" group that split apart, and the two clubs had an ongoing feud with each other. Sutton obtained surveillance footage from a house on FM 850 that showed the victim's motorcycle drive past, followed by a white Dodge truck with a unique type of bed installed. The motorcycle was traveling much faster than the surrounding traffic, and the truck was very close behind it, leading Sutton to believe that the motorcyclist was trying to get away from the truck. Because Sutton knew that Edwards was a member of the "1% Cossacks," he searched social media accounts of people who self-identified as UMC, and found a profile which featured a photo of the white Dodge truck. The "road name" on that profile was "Barcelona," subsequently identified as Jose Valenzuela. Investigators located and began surveilling Valenzuela's residence in Longview. When the white truck left the residence later that week, law enforcement personnel conducted a traffic stop, arrested Valenzuela, and impounded the truck. Sutton noted that the passenger side

_____

[1] A subsequent autopsy determined that Edwards's official cause of death was exsanguination caused by the gunshot wound. The bullet itself was not recovered, and the forensic pathologist who performed the autopsy could not opine as to the bullet's caliber.

of the truck appeared to have been wiped down, as though someone attempted to clean something off, but the rest of the truck was still covered with road film. Subsequent processing and testing of the truck's interior revealed gunshot residue on the headliner, indicating that a gun was fired from inside the truck.

**Accomplice Witness Statements**

*Jose Valenzuela*

During the investigation, Valenzuela spoke to law enforcement multiple times. He eventually provided Sergeant Jason Railsback with a complete recounting of the events of May 2 leading up to and following Edwards's death. Valenzuela stated that both he and Appellant had the rank of regional sergeant-at-arms in the UMC, while Jeffery Griffin was sergeant-at-arms for a local chapter of the club. On May 2, he, Griffin, and Appellant were traveling to Tyler in his work truck (a white Dodge with a custom bed) to retrieve UMC paraphernalia from a former member, with Valenzuela driving, Griffin riding in the back seat, and Appellant in the front passenger seat. The former member was not at his house, so the men decided to check an alternate location. They saw Edwards in traffic on the way there, and since there was a "smash on sight" order for 1% Cossacks, Valenzuela began following Edwards. The UMC members' initial intent was to get Edwards to pull over so that they could take his "cut," but Edwards did not pull over. Valenzuela stated that he did not know exactly why Griffin and Appellant started shooting, but they both began firing guns out of the truck's windows. Valenzuela saw Edwards's motorcycle exit the roadway, and heard Appellant say, "I got him." After the shooting, the three men proceeded to the residence of Travis Crenshaw, also a member of the UMC. Valenzuela used a saw from his truck to cut up the guns used in the shooting and placed the pieces in a bucket filled with wet concrete (made with a bag of concrete from Valenzuela's truck and water from Crenshaw's hose). Thereafter, another UMC member picked them up, leaving Valenzuela's truck at Crenshaw's house but taking the bucket of concrete with them.

*Jeffery Griffin*

According to Griffin, on the night of May 1, he and Appellant went to Valenzuela's house in Longview. While there, Griffin lent Valenzuela his 9mm Smith & Wesson pistol to test whether it would fit in Valenzuela's new shoulder holster. On the morning of May 2, Griffin, Valenzuela, and Appellant were riding together in Valenzuela's white Dodge truck (with Valenzuela driving and still wearing the shoulder holster containing Griffin's pistol, Appellant in

3

the front passenger seat, and Griffin in the back seat) to retrieve UMC property from a former club member. Griffin recalled that Appellant had a Glock handgun with him. They stopped at the combination convenience store and Whataburger to buy snacks, drinks, and cigarettes, then proceeded on to Tyler; the former member did not answer the door at his residence, so they decided to look for him at the American Legion, a local club hangout. After seeing Edwards on his motorcycle en route, Valenzuela decided (as the ranking club member) to follow Edwards and force him to stop, so that they could physically fight him and take his "cut." When it became apparent that Edwards would not stop, Valenzuela handed Griffin the 9mm pistol and stated, "We're going to get this mother[expletive]." The next time Edwards slowed down enough for the truck to catch up, Valenzuela instructed Griffin and Appellant to "smoke him," at which point both Griffin and Appellant began firing at Edwards. Griffin saw Edwards's motorcycle exit the roadway and crash, after which the three men verbally celebrated that they "got" Edwards before proceeding to Crenshaw's house. Appellant went into the house to speak to Crenshaw, while Griffin helped Valenzuela wipe down the passenger side of the truck (to remove gunshot residue or blood) as well as cut up the guns. Valenzuela used Crenshaw's water hose to mix a batch of concrete in a bucket containing the pieces of the handguns. Thereafter, another UMC member picked up the three men from Crenshaw's house, leaving the truck behind.

**Trial Testimony**

After being implicated by both Valenzuela and Griffin, Appellant was arrested and indicted for the offense of engaging in organized criminal activity, with the predicate offense of murder. He pleaded "not guilty," and the matter proceeded to a jury trial.

At trial, Valenzuela and Griffin testified consistent with their statements to law enforcement regarding Edwards's death. Additionally, Griffin testified about a "hunting mission" on the night of February 1, 2020, wherein Valenzuela dispatched Griffin, Appellant, and Crenshaw to the clubhouse of the 1% Cossacks located in Gilmer, Texas. The purpose of the mission was to "get [the 1% Cossacks] any way we can," and specifically to physically hurt the members and take their patches if possible. Griffin and Appellant previously participated in multiple similar "missions," but they did not always result in an altercation. However, on February 1, Griffin and Appellant got into a physical fight with two members of the 1% Cossacks at the clubhouse, with Griffin using a pair of brass knuckles during the fight.

4

Thereafter, Griffin, Appellant, and Crenshaw left Gilmer to return to the UMC clubhouse in Tyler. En route, police conducted a traffic stop and located two guns in the vehicle, a 9mm Smith & Wesson and a .40-caliber Glock. At the time of the stop, Griffin was holding both guns, but earlier that night, Appellant carried the .40-caliber Glock. Crenshaw was arrested for an unrelated warrant, but no one was charged with a crime related to the fight between the rival Cossacks groups.

*Travis Crenshaw*

Crenshaw testified at trial that he was no longer a member of the UMC but was a member of the club for approximately three years. He affirmed being involved in the "hunting mission" to find members of the 1% Cossacks in Gilmer, during which he witnessed some "violent club business." Crenshaw further stated that on the afternoon of May 2, Appellant called him and said that he and others would be coming to Crenshaw's residence but did not say why. Valenzuela, who Crenshaw called "the driver," came to the door first, instructed Crenshaw not to go outside, and asked whether there was a water hose, which Crenshaw pointed out to him. Thereafter, Appellant came inside; his demeanor was "solemn," and both men drank a shot of whiskey. A short time later, Valenzuela returned to the door and stated, "One of the fakes," which Crenshaw understood meant one of the 1% Cossacks, "had a wreck and doesn't look like he's going to make it." After approximately thirty to forty-five minutes, someone in a "little car" picked up Appellant and Valenzuela, leaving Valenzuela's truck at Crenshaw's house. Valenzuela returned to retrieve his truck the following day.

*Sergeant Jason Railsback*

Sergeant Railsback, then an investigator assigned to the Texas Anti-Gang Center, testified regarding the UMC in general as well as his actions during the investigation of Edwards's murder. He stated that in his experience, members of lawful motorcycle clubs often wear an identifying patch, or "cut," on their backs, but three-piece cuts, such as those worn by the UMC and the 1% Cossacks, are only used by outlaw motorcycle gangs. Sergeants at arms, such as Appellant and Valenzuela, are the "enforcement arm" of the club, in charge of handing out punishments to members (including physical punishment, usually a specified number of punches) as needed. Railsback also recounted the details of his interviews with Valenzuela and Griffin, consistent with the two men's trial testimony. Finally, Railsback opined generally that, based upon the evidence gathered during his investigation and his own experience and training,

the UMC as a whole associated with each other in the commission of planned criminal activities, and was therefore a criminal street gang.

*Special Agent Clay Steelman*

Special Agent Clay Steelman of the Texas Department of Public Safety's Criminal Investigation Division testified that his personal focus within the CID was organized crime, particularly outlaw motorcycle gangs. While assisting in the investigation of Edwards's murder, Steelman began seeing patches bearing the phrase "black eyes and apple pies" on members of the UMC and determined that the patch was a merit badge for committing "any type of violent act . . . on behalf of the club or during club business." Steelman further testified to a culture among the UMC related to tattoos, which usually had to be "earned" by a member and which would not be worn by an unaffiliated individual. He gave the example of a tattoo reading "RAW WAR," worn by both Appellant and Griffin, which he discovered was an acronym among the UMC for "Real Ass White (Boys) Will Always Retaliate." Steelman was aware of multiple occasions of violence, other than Edwards's murder, perpetrated by the UMC on the 1% Cossacks beginning in 2019. He stated that investigating these previous events was important because "[i]t provide[d] investigators with the evidence of are these random acts or is this more of an organized plan . . . it goes further into what we discussed earlier in terms of that regular criminal activity, where they were engaged in this type of activity on a fairly regular basis." Steelman identified the incident that took place on February 1, 2020, wherein Appellant, Crenshaw, and Griffin traveled to Gilmer with the purpose of assaulting 1% Cossacks members. Steelman alluded to other events of assault against the rival club in which Appellant participated, including an assault in Hubbard, Texas and a shooting in Marion County. He testified generally that as a sergeant-at-arms for the UMC, Appellant was expected to conduct violence on behalf of the club, particularly against 1% Cossacks. Overall, Steelman opined that the UMC met the legal definition of a criminal street gang, and Appellant met the legal definition of a member of a criminal street gang.

Steelman testified that he participated in Valenzuela's interviews with law enforcement, and during one of those interviews, Valenzuela stated that after the attack on Edwards, he and another UMC member disposed of the concrete block containing the gun pieces by throwing it into the Sabine River. Thereafter, the Texas Department of Public Safety's "dive team" retrieved the circular concrete block from the Sabine River, in substantially the same location Valenzuela

indicated. Subsequent lab analysis of the firearm pieces revealed that the serial numbers matched "the firearms that were ran the night of February 1," incident to the traffic stop of the car in which Appellant, Griffin, and Crenshaw were riding on their way back to Tyler from the altercation in Gilmer.

### *Other Trial Evidence*

The jury viewed images of Appellant's vest and the patches thereon, as well as photos of other UMC memorabilia connected to Appellant and his UMC-related tattoos. The State introduced additional surveillance footage from multiple businesses in the surrounding area which depicted the white Dodge truck pursuing Edwards's motorcycle, including footage from Mike's Automotive and At Home Health. Video taken from a combination Whataburger and gas station located in Liberty City before Edwards's death showed Appellant, Valenzuela, and Griffin in the truck, in the same seating configuration as described by Valenzuela and Griffin. Further, cell phone tracking data showed that phones belonging to all three men traveled the same route on the day of the murder, and all three phones traveled past the place where Edwards was shot before continuing on to Crenshaw's residence.

### *Charge of the Court and Jury Verdict*

At the charge conference before the trial court, Appellant requested that the jury charge include language related to concurrent causation, and further requested submission of criminally negligent homicide as a lesser included offense. The trial court denied submission of both issues.

The charge of the court as submitted to the jury alleged that Appellant committed the murder of Edwards as a primary actor, or alternatively, was criminally responsible as a party because he "solicited, encouraged, directed, aided, or attempted to aid the others in committing" the murder. The jury found Appellant "guilty" of the offense of engaging in organized criminal activity, with the underlying offense of murder, as alleged in the indictment.

At the outset of the trial on punishment, Appellant pleaded "not true" to the State's allegation that he used or exhibited a deadly weapon, namely a firearm, during the commission of or flight from the offense. During its deliberations, the jury sent a note to the court asking, "What is the purpose of the deadly weapon finding?" The court replied, "The Court cannot answer your question other than to tell you that you have been given all the law governing your decision and decision-making process in the charge." The jury ultimately returned a finding of

"not true" as to the deadly weapon issue and imposed a sentence of forty-five years' imprisonment. This appeal followed.

## SUFFICIENCY OF THE EVIDENCE

In his first issue, Appellant argues that the evidence adduced at trial was legally insufficient to show that (1) he had the requisite intent to kill Edwards, (2) the Cossacks were a "criminal street gang," (3) he continuously or regularly engaged in criminal activities, and (4) he committed the murder of Edwards as a primary actor.

### Standard of Review

When evaluating the sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 902 n.19 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See Jackson*, 443 U.S. at 315–16, 99 S. Ct. at 2786–87; *see also Escobedo v. State*, 6 S.W.3d 1, 6 (Tex. App.–San Antonio 1999, pet. ref'd). A successful legal sufficiency challenge will result in rendition of an acquittal by the reviewing court. *See Tibbs v. Florida*, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2217–18, 72 L. Ed. 2d 652 (1982).

A jury is free to believe all or any part of a witness's testimony or disbelieve all or any part of that testimony. *See Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.–Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006). A reviewing court must give full deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *Brooks*, 323 S.W.3d at 899 n.13; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In addition, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.

8

***Clayton***, 235 S.W.3d at 778. "Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt." ***Rodriguez v. State***, 521 S.W.3d 822, 827 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (citing ***Sorrells v. State***, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011)). Each fact need not point directly and independently to the appellant's guilt, provided that the cumulative force of all the incriminating circumstances is sufficient to support the conviction. ***Hooper***, 214 S.W.3d at 13.

The sufficiency of the evidence is measured against the offense(s) as defined by a hypothetically correct jury charge. *See **Malik v. State***, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct jury charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant is tried." ***Id.***

## Applicable Law

A person commits the offense of engaging in organized criminal activity if, "as a member of a criminal street gang, [he] commits or conspires to commit … murder." TEX. PENAL CODE ANN. § 71.02(a) (West 2023). A "criminal street gang" is statutorily defined as "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." ***Id.*** § 71.01(d) (West 2023). A person is a "member" of a criminal street gang when he is one of the three or more persons who continuously or regularly associate in the commission of criminal activities. ***Martin v. State***, 635 S.W.3d 672, 678 (Tex. Crim. App. 2021). "As" in the phrase "as a member of a criminal street gang" requires proof that the defendant was acting in the role, capacity, or function of a gang member at the time of the offense. ***Zuniga v. State***, 551 S.W.3d 729, 736 (Tex. Crim. App. 2018). To satisfy this requirement, the evidence need only be sufficient to show some nexus or relationship between the commission of the underlying offense and the defendant's gang membership. ***Id.*** at 739.

A person commits murder if he (1) intentionally or knowingly causes the death of another individual; (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or (3) commits or attempts to commit a felony, other than manslaughter, and in the course and furtherance of the commission or attempt, he

commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b) (West 2023).

**Accomplice Witness Testimony and Intent to Commit Murder**

Appellant contends that "no legally sufficient evidence was adduced at trial that Appellant intended to kill … Edwards," because the only evidence regarding his intent came from Valenzuela and Griffin, whose testimony was not sufficiently corroborated to satisfy the "accomplice witness rule" found in Article 38.14 of the Texas Code of Criminal Procedure.

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2023). The corroboration requirement in Article 38.14 does not apply separately to each element of the offense charged or to each aspect of the accomplice's testimony. *State v. Ambrose*, 487 S.W.3d 587, 598 (Tex. Crim. App. 2016). When evaluating the sufficiency of corroborating evidence under Article 38.14, we eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime. *Castillo v. State*, 221 S.W.3d 689, 691–92 (Tex. Crim. App. 2007). This "tends to connect" standard does not present a high threshold as the "evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). "Rather, the [non-accomplice] evidence must simply link the accused in some way to the commission of the crime." *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008).

The sufficiency of non-accomplice evidence is judged according to the particular facts and circumstances of each case. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense. *Id.* As the Texas Court of Criminal Appeals has explained,

> No precise rule can be formulated as to the amount of evidence required to corroborate. The non-accomplice evidence does not need to be in itself sufficient to establish guilt beyond a reasonable doubt. Nor must the non-accomplice evidence directly link the accused to the commission of the offense. While the accused's mere presence in the company of the accomplice before, during, and after the commission of the offense is insufficient by itself to corroborate accomplice testimony, evidence of such presence, coupled with other suspicious circumstances, may tend to connect the accused to the offense. Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration.

***Dowthitt v. State***, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996). In determining whether the non-accomplice evidence tends to connect the defendant to the commission of the offense, we view the evidence in the light most favorable to the jury's verdict. ***Turner v. State***, 571 S.W.3d 283, 287–88 (Tex. App.—Austin 2019, pet. ref'd).

In this case, setting aside Valenzuela's and Griffin's testimony, there is sufficient non-accomplice evidence that tends to connect Appellant to the offense. The surveillance footage from the Whataburger store confirmed that Appellant was in Valenzuela's truck on the day of the murder, and that the men were seated in the truck as described by the co-defendants. The cell phone tracking data showed that Appellant's cell phone, an item usually carried in proximity to its owner, traveled the same route as Valenzuela's and Griffin's phones did on the date of the offense, both before and after Edwards was shot. Video obtained from other businesses shows that Valenzuela's truck followed Edwards's motorcycle for an extended time that day, including on the road where the murder took place. While Appellant's mere presence in Valenzuela's truck during the commission of the crime cannot alone corroborate Valenzuela's and Griffin's testimony, courts have held that a defendant keeping company with the accomplice at or near the time of the offense is a significant factor in determining corroboration. *See **Hernandez v. State***, 939 S.W.2d 173, 177–178 (Tex. Crim. App. 1997) (evidence that appellant was in the company of the accomplice at or near the time or place of a crime is proper corroborating evidence to a conviction); *see also **Jackson v. State***, 745 S.W.2d 4, 13 (Tex. Crim. App. 1988) (presence of accused in the company of the accomplice, near the offense, while not conclusive, is nevertheless an important factor in determining corroboration). Crenshaw's testimony placed Appellant in Valenzuela's company after the attack on Edwards, and further indicated that (1) Appellant did not have prior plans to visit Crenshaw, but suddenly decided to do so without specifying a reason, (2) Appellant's demeanor was unusually "antsy" on the phone, but solemn during the visit, and (3) the incident prompting Appellant's visit related to a member of the 1% Cossacks being in a potentially fatal motorcycle wreck. Texas courts have held that "suspicious circumstances" can include nervous and furtive behavior. ***McAfee v. State***, 204 S.W.3d 868, 883 (Tex. App.—Corpus Christi 2006, pet. ref'd). Additionally, the pieces of the firearms used to kill Edwards, recovered from the Sabine River, matched the serial numbers of firearms present in the vehicle during the traffic stop subsequent to the Gilmer assault (a vehicle in which it is undisputed that Appellant was present at the time of the stop).

11

The "tends to connect" standard is not a demanding one. *See Solomon*, 49 S.W.3d at 361. Viewing the evidence in its totality and deferring to the jury's resolution thereof, we conclude that a rational jury could have found that the foregoing non-accomplice evidence tended to connect Appellant to the murder, and therefore found sufficient corroboration of Valenzuela's and Griffin's testimony to support a finding on the element of intent. *See Casanova v. State*, 383 S.W.3d 530, 534 (Tex. Crim. App. 2012) ("[W]hen there are two permissible views of the evidence (one tending to connect the defendant to the offense and the other not tending to connect the defendant to the offense), appellate courts should defer to that view of the evidence chosen by the fact-finder.").

Both Valenzuela and Griffin testified that Appellant shot a firearm at Edwards from the truck window. It was the sole province of the jury to decide to believe or disbelieve this testimony, and we may not substitute our judgment for the fact finder's by reevaluating the weight and credibility of the evidence. *Brooks*, 323 S.W.3d at 899. A jury may infer the intent to kill from the use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon, and a firearm is a deadly weapon per se. *See Parish v. State*, 488 S.W.3d 422, 427 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Viewing the evidence in this case in the light most favorable to the verdict, the jury could reasonably have inferred from the evidence before it that Appellant intended to kill Edwards. *See Clayton*, 235 S.W.3d at 778. Accordingly, we overrule this portion of Appellant's first issue.

**"Criminal Street Gang" Status**

Appellant argues that the evidence was legally insufficient to support a finding that UMC is a "criminal street gang." He concedes that the group has a common identifying sign or symbol and an identifiable leadership and does not dispute that the UMC are a group of three or more persons. However, he claims that the State presented no "objective evidence" (such as "statistics" or "designations in official reports") that the UMC qualifies as a "criminal street gang" under Section 71.01(d).[2] We therefore infer that Appellant challenges the sufficiency of the evidence to prove the remaining requirement, namely that the UMC "continuously or regularly associate in the commission of criminal activities."

---

[2] We note that Appellant cites no authority in support of his apparent contention that the evidence that an organization is a "criminal street gang" must be "objective" or derived from the "official" sources Appellant suggests.

Steelman testified to multiple incidents of criminal activity by UMC members, each involving acts of violence. In October 2019, members of the UMC (including Appellant) traveled to a 1% Cossacks clubhouse in Hubbard and assaulted the club members as they were leaving. UMC members, again including Appellant, carried out a similar "mission" in February 2020 in Gilmer, resulting in a fight between the two clubs. Steelman also referenced, but did not describe in detail, a shooting incident involving UMC members which took place in Marion County. He further explained that UMC members could earn merit patches for committing acts of violence on behalf of the club, including assault, robbery, or murder. Both Steelman and Sergeant Railsback testified that based upon their own knowledge, training, and experience, the UMC met the legal definition of a criminal street gang. The jury also heard evidence from current and former members of the UMC regarding the club's endorsement and participation in criminal activity. Valenzuela stated that the club had a standing "smash on sight" order under which UMC members were expected to recover any Cossacks paraphernalia from any 1% Cossacks through the use of physical force. Griffin described sanctioned "hunting missions" (including the one in Gilmer), in which Valenzuela or other individuals in the UMC leadership instructed club members to go to specified locations and find 1% Cossacks to assault. Similarly, Crenshaw agreed that the mission to Gilmer was "violent club business." Finally, Valenzuela and Griffin both testified that the attack on Edwards was motivated not by any personal animus, but by the UMC's order to attack 1% Cossacks and the expectation that they, as members, would follow that order. All of these incidents constitute criminal activity perpetrated by UMC members on behalf of the group and permit an inference by the jury that UMC intended to continue engaging in a course of similar violent criminal activity against 1% Cossacks members. *See **Lashley v. State***, 401 S.W.3d 738, 744-45 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

Viewing the foregoing evidence in the light most favorable to the jury's verdict, we conclude that the evidence was legally sufficient to establish that the UMC met the statutory definition of a "criminal street gang" set forth in Section 71.01(d). We overrule this portion of Appellant's first issue.

**Membership in Criminal Street Gang**

Appellant claims that the evidence is insufficient to show that he, as an individual, continuously or regularly engaged in criminal activities as a member of the UMC (and therefore was insufficient to show that he was a "member" of a criminal street gang under the legal

definition).[3] In support, he cites the Court of Criminal Appeals' ruling in **Martin v. State**, wherein the court determined that for the offense of unlawful carrying of a weapon by a gang member, the State must prove both that (1) the individual is a member of a criminal street gang, and (2) the individual *personally* "continuously or regularly associate[s] in the commission of criminal activities" in connection with his gang membership. *Martin*, 635 S.W.3d at 677. Specifically, the court determined that requiring personal involvement with the gang's criminal activity prevented prosecution of an individual "who is unaware of the gang's criminal activities and who has not personally committed a crime" for simply being affiliated with a gang while in possession of a firearm (conduct that is not otherwise criminal). *Id.* at 677-79.

Whether, and how, this ruling is applicable to the offense of engaging in organized criminal activity is yet to be conclusively determined. Our sister court determined in **Bittick v. State** that the State was still required to show the defendant's "individual participation in crime" under Section 71.02 but could satisfy the requirement by proving the defendant committed the offense underlying the organized criminal activity charge. *See **Bittick v. State***, 680 S.W.3d 405, 417 (Tex. App.—Fort Worth 2023, pet. granted). The court reasoned that unlike the offense of unlawful carrying of a weapon by a gang member, "the offense of engaging in organized criminal activity does not criminalize otherwise-lawful activity," but only "enhanced the severity of an already-unlawful act based on [the defendant's] commission of it in his capacity as a member of a criminal street gang." *Id.* at 418. Therefore, "when the State proved that [the defendant] committed the underlying predicate crime, it simultaneously proved his individual participation in crime." *Id.* We also note that the Court of Criminal Appeals upheld a conviction for engaging in organized criminal activity where the evidence showed that the defendant "engaged in the underlying offense 'as a member of a criminal street gang,' in the sense that he was acting pursuant to his role or capacity as a gang member at the time that he committed the offense." *See **Zuniga***, 551 S.W.3d at 739. In listing the elements of a hypothetically correct jury charge on the offense, the court did not name as an element a requirement that the defendant *himself* "continuously or regularly" committed criminal acts, but only that the criminal street gang did so. *Id.* at 734-36.

---

[3] Appellant does not appear to dispute that he is a member of the UMC in the colloquial sense. However, we note that the evidence of Appellant's affiliation with the UMC (including testimony about Appellant's role in the organization, as well as Appellant's tattoos, vest, and other paraphernalia) is more than sufficient to support a jury finding regarding Appellant's association with the UMC.

However, in the instant case, we need not reach the question of whether Appellant's individual participation in the criminal activities of the UMC was sufficiently proven only by proof of the predicate murder of Edwards. As aforementioned, the jury heard evidence of Appellant's participation in other criminal acts on behalf of, or pursuant to his membership in, the UMC, specifically the "hunting missions" (essentially planned assaults) on 1% Cossacks that occurred in Gilmer and Hubbard. *See Chaddock v. State*, 203 S.W.3d 916, 922 (Tex. App.—Dallas 2006, no pet.) (evidence that gang member engaged in a "pattern of assaultive behavior" sufficient to support finding that he was a member of "criminal street gang" as defined by the Penal Code). Moreover, Steelman testified that the "black eyes and apple pies" patch on Appellant's vest indicated that Appellant committed some act of violence on behalf of the UMC, which he affirmed could include robbery, assault, or murder. Even under the higher standard set forth in *Martin*, we conclude that there was sufficient evidence from which the jury could rationally conclude that Appellant continuously or regularly engaged in criminal activities as a member of the UMC, and therefore that he was a member of a criminal street gang. We overrule this portion of Appellant's first issue.

**Deadly Weapon Finding**

Appellant further alleges that "[i]t was impossible for Appellant to have killed Mr. Edwards as a primary actor because there was no subsequent jury finding that Appellant used or exhibited a deadly weapon at the time the offense was committed." We understand Appellant's argument to assert that because the jury returned a negative deadly weapon finding at the *punishment* phase of trial, the evidence was legally insufficient to support a finding at the *guilt-innocence* phase that Appellant shot at Edwards with a firearm. Therefore, Appellant claims, the evidence is legally insufficient to support a finding that he was "guilty" of Edwards's murder as a primary actor.

We note that the charge of the court permitted the individual members of the jury to find Appellant "guilty" as either a primary actor or pursuant to the law of parties and did not require that the jurors be unanimous as to the theory under which they find Appellant "guilty." It is possible that the jury unanimously found Appellant "guilty" as a party rather than a primary actor. Therefore, we cannot conclusively determine from the record whether the jury's verdict on Appellant's guilt is truly inconsistent with its finding on the deadly weapon issue. However, assuming that such inconsistency exists, legal sufficiency is not undermined solely because of

inconsistencies in the jury's verdict. *See Leal v. State*, 527 S.W.3d 345, 347 (Tex. App.—Corpus Christi 2017, no pet.) (citing *United States v. Powell*, 469 U.S. 57, 64, 105 S. Ct. 471, 83 L.Ed.2d 461 (1984)). Inconsistent verdicts do not necessarily imply that the jury convicted the defendant on insufficient evidence but may simply stem from the jury's desire to be lenient or to execute its own brand of executive clemency. *Thomas v. State*, 352 S.W.3d 95, 101 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). Any attempt to determine the jury's reasons for such inconsistencies would require pure speculation and involve an improper inquiry into jury's deliberations. *See Ayala v. State*, No. 03-16-00045-CR, 2017 WL 6273256, at *3 (Tex. App.—Austin Dec. 7, 2017, pet. ref'd) (mem. op., not designated for publication).

The Texas Court of Criminal Appeals observed that "[i]f a deadly-weapon special issue is submitted to a jury, the jury may answer that issue 'no' even in a case in which use of a deadly weapon is a necessary element of the offense. Such a result in a jury trial would be internally inconsistent, but the law does not bar inconsistent verdicts." *Guthrie–Nail v. State*, 506 S.W.3d 1, 6 (Tex. Crim. App. 2015); *see also Sauceda v. State*, 739 S.W.2d 375, 376 (Tex. App.—Corpus Christi 1987, pet. ref'd) (inconsistency between the verdict and the [deadly weapon] special issue finding [at punishment phase] is analogous to cases involving inconsistent verdicts). Instead, "where the jury return[s] verdicts on guilt and punishment that seem inconsistent on the issue of deadly weapon use, [appellate] analysis is restricted to a determination of whether the evidence was legally sufficient to support independently each count upon which conviction is based." *Chavez v. State*, 860 S.W.2d 714, 716 (Tex. App.—El Paso 1993, no pet.).[4]

Pertaining to the underlying offense of murder, we determined *infra* that a rational trier of fact could have found beyond a reasonable doubt that Appellant had the requisite intent to cause death or severe bodily injury to Brandon Edwards. Moreover, the testimony of Valenzuela and Griffin, as well as the autopsy report in evidence, supports a finding that Appellant's conduct in shooting a firearm at Edwards caused Edwards's death (either as a primary actor or a party, since it remains unresolved whose weapon discharged the fatal bullet). Pertaining to the charged offense of engaging in organized criminal activity, we previously concluded that legally

---

[4] "Despite the conviction and the fact that a handgun is a per se deadly weapon, the jury failed to find the use of a deadly weapon at the punishment phase of the trial … Despite seemingly inconsistent findings, so long as the evidence supports the finding of guilt, the *Dunn* rule requires the trial court to accept the verdict of the jury." *West v. State*, No. 03-01-00309-CR, 2002 WL 1289749, at *2 (Tex. App.—Austin June 13, 2002, pet. ref'd) (mem. op., not designated for publication) (citing *Dunn v. United States*, 284 U.S. 390, 393–94, 52 S. Ct. 189, 76 L.Ed. 356 (1932)). The United States Supreme Court later reaffirmed the rule set forth in *Dunn* in *Powell*. *See United States v. Powell*, 469 U.S. 57, 64, 105 S. Ct. 471, 83 L.Ed.2d 461 (1984).

sufficient evidence was adduced at trial for both the UMC's status as a criminal street gang and Appellant's status as a member of said criminal street gang. Turning to the final element, that Appellant was "acting in the role, capacity, or function of a gang member at the time of the offense," the jury heard evidence about the previously discussed "smash on sight" order for 1% Cossacks as well as the testimony of Valenzuela, Griffin, and Crenshaw, regarding the conflict between the UMC and the 1% Cossacks. Moreover, Steelman testified as to the reasoning for and extent of the two gangs' ongoing feud and the violence inherent within Appellant's role as regional sergeant-at-arms. This evidence is sufficient to show "some nexus or relationship" between the attack on Edwards and Appellant's gang membership. *Zuniga*, 551 S.W.3d at 736, 739. Consequently, we conclude that the evidence was overall legally sufficient to support Appellant's conviction for engaging in organized criminal activity, despite any inconsistency caused by the jury's negative deadly weapon finding. And, having determined that the evidence supports the jury's finding of guilt, we overrule this final portion of Appellant's first issue, and overrule Appellant's first issue as a whole.

### JURY CHARGE ERROR – CONCURRENT CAUSATION

In his second issue, Appellant alleges that the trial court erred in denying his request for a jury instruction on concurrent causation.

### Standard of Review

In reviewing a jury charge issue (a two-step process), an appellate court's first duty is to determine whether error exists in the jury charge. *Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996), *overruled in part on other grounds by Gelinas v. State*, 398 S.W.3d 703, 706-08 (Tex. Crim. App. 2013). We review a trial court's refusal to include a defensive issue in the charge for an abuse of discretion. *Wesbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000). An accused is entitled to an instruction on every defensive issue raised by the evidence. *Hayes v. State*, 728 S.W.2d 804, 807 (Tex. Crim. App. 1987). This is true whether the evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the evidence. *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996). Conversely, the defendant is not entitled to an instruction that is not raised by the evidence. *Remsburg v. State*, 219 S.W.3d 541, 545 (Tex. App.—Texarkana 2007, pet. ref'd).

17

We must view the evidence in the light most favorable to the defendant's requested submission. ***Bufkin v. State***, 207 S.W.3d 779, 782-83 (Tex. Crim. App. 2006).

If error is found, the appellate court must analyze that error for harm. ***Middleton v. State***, 125 S.W.3d 450, 453–54 (Tex. Crim. App. 2003). If error was properly preserved by objection, reversal will be necessary if the error was not harmless.[5] ***Almanza v. State***, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985), *overruled on other grounds*, ***Rodriguez v. State***, 758 S.W.2d 787, 788 (Tex. Crim. App. 1988). We review the record to evaluate whether defendant "suffered some actual, rather than merely theoretical, harm from the error." ***Warner v. State***, 245 S.W.3d 458, 462 (Tex. Crim. App. 2008). The harm analysis requires consideration of (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record. ***Reeves v. State***, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

**Applicable Law**

The scope of causation under the Texas Penal Code is broad, allowing courts to find causation where "the result would not have occurred but for [the] conduct, operating either alone or concurrently with another cause." TEX. PENAL CODE ANN. § 6.04(a) (West 2023). Where two or more causes satisfy "but for" causation, a criminal defendant remains liable if his conduct was either sufficient to have caused the result alone "regardless of the existence of a concurrent cause," or both causes "together" were sufficient to cause the result. ***Cyr v. State***, 665 S.W.3d 551, 557 (Tex. Crim. App. 2022). An individual's guilt may not be premised on his conduct being a mere "contributing factor" without more. ***Id.*** As the Court of Criminal Appeals explained in ***Cyr***,

> To illustrate: Two arsonists each light fire to the same house, one on the east side and one on the west side, both of which are independently sufficient to burn the house to the ground. Neither arsonist is entitled to an instruction on concurrent causation and both are criminally liable. The same result is reached if both fires would independently be insufficient to burn the house to the ground, but the combined force of the east fire and the west fire causes such a result. Only where the east arsonist can produce evidence that his fire was clearly insufficient to burn the house to the ground, and the west arsonist's clearly sufficient acting alone, would the east arsonist be entitled to an instruction on concurrent causation and potentially escape liability for the full extent of the damage caused under concurrent causation.

---

[5] Conversely, if error was not preserved at trial by a proper objection, a reversal will be granted only if the error presents egregious harm, meaning the appellant did not receive a fair and impartial trial. ***Reeves v. State***, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

*Id.* Section 6.04(a) entitles a defendant to an instruction on concurrent causation when he shows (1) "an agency in addition to the actor" was a "but for" cause of the result charged, and (2) some evidence demonstrates his conduct is "clearly insufficient" to cause the harm and the other, concurrent cause is clearly sufficient to cause the harm. *Id.* at 557-58.

**Analysis**

Applying the framework set forth in *Cyr* to the instant case, we must first ask whether Appellant has shown the existence of a concurrent cause. The uncontradicted evidence herein shows that Edwards died as the result of one injury—a single gunshot wound to his torso. The bullet casings and bullet recovered from the crime scene established that two different firearms (of two different calibers) were fired at Edwards, with a .40 caliber jacket and separate fragment found next to his body and in his helmet, respectively, and a 9mm bullet lodged in the front tire of Edwards's motorcycle. Although the record is inconclusive as to the caliber of the bullet that caused the fatal wound, evidence adduced at trial showed that both Appellant and Griffin discharged firearms during the attack on Edwards. Moreover, as it remains unclear which firearm fired the fatal shot, but it is undisputed that Edwards suffered only one gunshot wound, Appellant does not point to any evidence in the record showing that Griffin's conduct in firing at Edwards (rather than Appellant's own, identical conduct) was necessarily a but-for cause of Edwards's death. Under the facts of this case, a concurrent causation instruction was not required, because there is no evidence that "two or more causes satisfy 'but for' causation." *Id.* at 557; *see also* **Chapa v. State**, No. 13-23-00107-CR, 2024 WL 2859379, at *6 (Tex. App.—Corpus Christi June 6, 2024, no pet.) (mem. op., not designated for publication).

However, even assuming *arguendo* that Griffin's conduct fulfills the first factor in Section 6.04(a), Appellant failed to meet the second factor, precisely because there is no evidence showing which firearm fired the shot that killed Edwards. Appellant cannot direct us to any evidence that his conduct was "clearly insufficient" to cause the harm, as the record supports an inference that Appellant fired the fatal shot. *See, e.g.*, **Bonilla v. State**, No. 14-20-00061-CR, 2022 WL 97716, at *5 (Tex. App.—Houston [14th Dist.] Jan. 11, 2022, pet. ref'd) (mem. op., not designated for publication) (no evidence that appellant's conduct alone [in firing a gun at the victim] was clearly insufficient by itself to cause victim's death). Nor can he point to evidence that Griffin's actions alone were "clearly sufficient" to cause Edwards's death, because the record *also* supports an inference that none of the shots fired by Griffin struck Edwards at all.

19

Thus, the appropriate question for the jury was whether Appellant was criminally responsible for Edwards's death, as a principal or party, a dispute which was "appropriately addressed by the essential elements of the crime." *Cyr*, 665 S.W.3d at 562.

We conclude that the evidence did not raise the issue of concurrent causation, and therefore the trial court did not abuse its discretion by declining to include Appellant's requested instruction in the jury charge. We overrule Appellant's second issue.

## Harm/Due Process Claim

Appellant also argues in his fourth issue that the jury's inability to consider concurrent causation violated his right to due process under the United States Constitution and the Texas Constitution. However, Appellant did not raise a *constitutional* objection at trial regarding the submission of the concurrent causation language. Constitutional due process complaints must be preserved by an objection at trial, and by failing to raise a constitutional due process complaint in the trial court, a defendant forfeits appellate review of the issue. *See Garcia v. State*, No. 02-21-00203-CR, 2022 WL 17173127, at *2 (Tex. App.—Fort Worth Nov. 23, 2022, pet. ref'd) (mem. op., not designated for publication) (citing *Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009)); *Clark v. State*, 365 S.W.3d 333, 340 (Tex. Crim. App. 2012). Because Appellant's trial objection does not comport with the issues raised on appeal, he has preserved nothing for our review. *See Wright v. State*, 154 S.W.3d 235, 241 (Tex. App.—Texarkana 2005, pet. ref'd) (citing *Dixon v. State*, 2 S.W.3d 263, 273 (Tex. Crim. App. 1998)); *Penry v. State*, 903 S.W.2d 715, 729 (Tex. Crim. App. 1995). We overrule the portion of Appellant's fourth issue pertaining to the requested concurrent causation language.

## LESSER INCLUDED OFFENSE INSTRUCTION

In his third issue, Appellant alleges that the trial court erred in denying his request for a jury instruction on the lesser included offense of criminally negligent homicide.

## Standard of Review and Applicable Law

We review a trial court's refusal to submit a lesser included offense instruction for an abuse of discretion. *Chavez v. State*, 666 S.W.3d 772, 776 (Tex. Crim. App. 2023). The Texas Code of Criminal Procedure provides that an offense is a lesser included offense if it is established by proof of the same or less than all the facts required to establish the commission of the offense charged. TEX. CODE CRIM. PROC. ANN. art. 37.09(1). In the first prong of a two-part

test, we compare the statutory elements of the alleged lesser offense with the statutory elements of the greater offense and any descriptive averments in the indictment. *Chavez*, 666 S.W.3d at 776. If proof of the lesser offense is included within proof of the greater offense, the first step has been satisfied. *Id.* The first prong presents a question of law, and it does not depend on the evidence to be produced at trial. *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011).

In the second prong, we consider whether the trial evidence would permit a jury to find that if the defendant is guilty, he is guilty only of the lesser offense. *Chavez*, 666 S.W.3d at 776. This requirement is met if evidence either affirmatively refutes or negates other evidence establishing the greater offense, or the evidence on the issue is subject to two different interpretations, and one of the interpretations negates or rebuts an element of the greater offense. *Schweinle v. State*, 915 S.W.2d 17, 19 (Tex. Crim. App. 1996). There must be evidence that is directly germane to the lesser included offense and presents the lesser included offense as a valid, rational alternative to the greater offense. *Chavez*, 666 S.W.3d at 777.

## Analysis

Criminally negligent homicide is committed when a person "causes the death of an individual by criminal negligence." TEX. PENAL CODE ANN. § 19.05(a) (West 2023). Criminally negligent homicide involves inattentive risk creation, that is, the actor should be aware of the risk surrounding his conduct or the result thereof but fails to perceive said risk. *Stadt v. State*, 182 S.W.3d 360, 364 (Tex. Crim. App. 2005). "The key to criminal negligence is the failure of the actor to perceive the risk created by his conduct." *Trujillo v. State*, 227 S.W.3d 164, 168 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). "If the evidence shows that the defendant's awareness is such that he perceived the risk his conduct created, he is not entitled to a charge of criminally negligent homicide." *Id.* Criminally negligent homicide is a lesser included offense of murder because it differs from murder in the respect that a less culpable mental state suffices to establish its commission, fulfilling the first prong of the test. *Melton v. State*, 660 S.W.3d 199, 206 (Tex. App.—Austin 2022, pet. ref'd) (citing *Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992)). Accordingly, the only remaining issue is "whether there is some evidence from which the jury rationally could have found that, if appellant was guilty, he was guilty only of the lesser offense of criminally negligent homicide." *Id.*

To preserve error, issues on appeal must correspond or comport with objections and arguments made at trial. *Wright*, 154 S.W.3d at 241 (citing *Dixon*, 2 S.W.3d at 273). On

21

appeal, Appellant states (without any citation to the record), "The scintilla of evidence necessary to have entitled Appellant to the lesser-included offense instruction of Criminally Negligent Homicide was the fact that Appellant continued to remain in the truck without acting when Mr. Griffin began shooting a gun at Mr. Edwards. At that point, Appellant should have perceived the risk that Mr. Edwards would be killed." However, when Appellant requested an instruction on criminally negligent homicide before the trial court, he did not advance the theory that he took no action while Griffin shot at Edwards:

> We would allege that there is no corroborated evidence, other than the testimony of the codefendants, that Mr. Tibbits intentionally or knowingly killed Mr. Edwards for the following reasons: Number one, there is no evidence of which weapon fired the fatal shot. Number two, while there is evidence that Mr. Tibbits is in the truck and fired a weapon, we do not know which weapon fired the fatal shot. And we do not know whether Mr. Tibbits had any intention to kill Brandon Edwards. As was stated by defendant -- codefendants Valenzuela and Griffin, they only intended to, quote, "mess with" Mr. Edwards. They only intended to pull or force Mr. Edwards off the road and either beat him, steal his cut, rip off a patch, what have you.
>
> …
>
> We don't know, and there's been no testimony, whether or not Mr. Tibbits was directly firing at Mr. Edwards. Where the shell casings were located, this could have happened by a ricochet. He could have been firing not in the direction of Mr. Edwards but rather to make it look good so that he could comply with Mr. Valenzuela's orders and not hit Mr. Edwards. There's no indication what Mr. Tibbits was thinking at the time.
>
> …
>
> There's been some testimony in this case that there was some other motorcyclist around the crime scene at the time or very close to the time the crime happened and that that motorcyclist had on a cut that was black and white, which we know to be the Mongols, based on Sergeant Railsback's testimony. And we know that the Mongols are a rival motorcycle club. I would submit to the Court that that constitutes a scintilla of evidence, testimony of codefendants, rival motorcycle club around the crime scene. That at least is a scintilla of evidence that someone other than Mr. Tibbits shot at Mr. Edwards and that there was no intention to kill Mr. Edwards, which speaks to the mens rea of the charged offense.

Because Appellant's objection at trial does not comport with the basis of his argument on appeal, he failed to preserve this issue for our review. *See **Penry***, 903 S.W.2d at 729.

Moreover, Appellant failed to preserve error by his trial objection by neglecting to identify any specific, affirmative evidence germane to the offense of criminally negligent homicide. As the trial court correctly stated, "[T]he absence of evidence is not some evidence in support of the lesser." *See **Cavazos v. State***, 382 S.W.3d 377, 385 (Tex. Crim. App. 2012) (meeting second prong of test "requires more than mere speculation—it requires *affirmative* evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense.") (emphasis added). The sole item of specific evidence Appellant mentioned at

trial was the statement of Tracey Lornson, who did not testify at trial, as paraphrased by the Smith County Sheriff's Office in its police report.[6]  Even if Appellant did not abandon this argument on appeal, Appellant offers no analysis or explanation as to *how* a different motorcyclist (even one potentially from a rival club) traveling on the same road at an unknown time after Edwards's death is in any way relevant to his contention that *Appellant failed to perceive the risk* that Edwards could die as a result of Appellant's own conduct.  Appellant failed to specify any affirmative evidence that would present the lesser included offense as a valid, rational alternative to the charged offense, and such evidence was not otherwise manifest. ***Williams v. State***, 662 S.W.3d 452, 464 (Tex. Crim. App. 2021).  On appeal, Appellant still fails to identify any evidence that would raise the offense of criminally negligent homicide.  While he argues for the first time that he merely "remain[ed] in the truck without acting" while Griffin fired two guns at Edwards, he does not cite to (or even generally allude to) any portion of the record evidencing this alleged "fact."  Our review of the record similarly does not reveal any such evidence, whether testimonial or documentary.

We overrule Appellant's third issue.

## Harm/Due Process Claim

Relatedly, Appellant contends in his fourth issue that the absence of the lesser included offense instruction harmed him and violated his right to due process because it "operated as a bar to one of Appellant's defensive theories to Appellant's detriment, preventing the jury from considering a plausible reason to impose a lesser sentence on Appellant."

As an initial matter, Appellant does not cite, and we do not find, any Texas jurisprudence expressly holding that a lesser included offense instruction must be given as a matter of due process under either the federal or Texas constitutions.  The Fifth Circuit has specifically held that in a non-capital case, the failure to give an instruction on a lesser-included offense does not raise a federal constitutional issue.  *See, e.g.,* ***Sanders v. Dir., TDCJ-CID***, No. 9:14CV9, 2017 WL 1022790, at *4 (E.D. Tex. Mar. 16, 2017) (citing ***Creel v. Johnson***, 162 F.3d 385, 390 (5th Cir. 1998)).  And at least one of our sister courts has held similarly pertaining to the Texas constitution.  *See* ***Murphy v. State***, 26 S.W.3d 502, 505 (Tex. App.—El Paso 2000, pet. ref'd);

---

[6] The substance of Lornson's statement was that she saw a man on a motorcycle seemingly fleeing from a white truck and heard five gunshots after the vehicles were out of sight.  An unspecified amount of time after the shooting, Lornson saw a different man on a motorcycle wearing white and black colors on his jacket come through the area.

*Easter v. State*, 867 S.W.2d 929, 941 (Tex. App.—Waco 1993, pet. ref'd) ("Having determined that Easter was not entitled to an instruction on the lesser-included offense, we find that he was not denied due process."). Therefore, it is doubtful whether the due process analysis Appellant invokes is applicable to this issue.

Even assuming *arguendo* that the absence of Appellant's requested lesser included offense instruction implicated the right to due process, we cannot conclude that Appellant was harmed, denied a fair trial, or deprived of his right to due process by the trial court's proper refusal to charge the jury as Appellant requested. *See Ybarra v. State*, 621 S.W.3d 371, 384 (Tex. App.—Eastland 2021, pet. ref'd). In fact, no harm or due process violation could exist, because as we determined *infra*, the evidence presented at trial does not support the submission of criminally negligent homicide. *See Phillips v. State*, 463 S.W.3d 59, 64 (Tex. Crim. App. 2015) (court first determines whether jury charge contained actual error; only if actual error is present does court determine whether error resulted in sufficient harm to require reversal); *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012) (if court determines no charge error occurred, court's analysis ends). Appellant presented no evidence from which we could determine that the trial court's omission of a jury instruction on criminally negligent homicide was an abuse of discretion, much less that it was so grave as to amount to a denial of his constitutional right to substantive due process. We overrule the remaining portion of Appellant's fourth issue.

## DISPOSITION

Having overruled each of Appellant's four issues, we ***affirm*** the judgment of the trial court.

JAMES T. WORTHEN
Chief Justice

Opinion delivered August 29, 2024.
*Panel consisted of Worthen, C.J, Hoyle, J., and Bass, Retired J., Twelfth Court of Appeals, sitting by assignment.*

(DO NOT PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**AUGUST 29, 2024**

**NO. 12-23-00310-CR**

**JOSHUA RAY TIBBITS,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

---

Appeal from the 114th District Court

of Smith County, Texas (Tr.Ct.No. 114-0973-20)

---

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED, and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J, Hoyle, J., and Bass, Retired J., Twelfth Court of Appeals, sitting by assignment.*